FILED
at ___ O'clock & ___ min ___M
OCT 7 2004
BRENDA K. ARGOE, CLERK
United States Bankruptcy Court
Columbia, South Carolina

ENTERED
OCT 7 2004
K.R.W.

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE:<br><br>Ducane Gas Grills, Inc.,<br><br>                      Debtor. | C/A No. 04-15219-W<br><br>Adv. No. 04-80160-W<br><br>**ORDER**<br><br>Chapter 11 |
| Newman Grill Systems, LLC, Marc Newman, and Amy Newman,<br><br>                      Plaintiffs,<br><br>v.<br><br>Ducane Gas Grills, Inc., Weber-Stephen Products, Co., Ira Zolin, and Ducane Products Co.,<br><br>                      Defendants. | |

This matter comes before the Court upon Plaintiffs' Objection to Defendants' Motion for Summary Judgment. In the Objection and in connection with the hearing on Defendants' Motion for Summary Judgment, Newman Grill Systems, L.L.C, Marc Newman and Amy Newman (collectively, the "Plaintiffs") requested disqualification of Nexsen Pruet Adams Kleemeir, L.L.C. ("Nexsen Pruet"), as counsel for Weber-Stephen Products, Co. and Ducane Products Co., a South Carolina corporation formed as a result of Weber's purchase of Ducane's assets (collectively Weber-Stephen Products, Co. and Ducane Products Co. shall be referred to as "Weber"), on the grounds that Nexsen Pruet worked with Plaintiffs during the patent application process arising from Plaintiffs' assignment of intellectual property to Ducane Gas Grills ("Ducane"). The Court heard arguments on the disqualification issue and provided the Plaintiffs and Weber an opportunity to file briefs. After considering the parties'



arguments and their briefs, the Court makes the following findings of fact and conclusions of law.[1]

**FINDINGS OF FACT**

1. In April 2002, Marc and Amy Newman, who are members of Newman Grill Systems, L.L.C. ("Newman Systems"), a limited liability company formed in Oklahoma, began developing a specialized multi-purpose grill (the "Chuck Wagon") that could be transported to football games.[2]

2. In September 2002, the Plaintiffs introduced the Chuck Wagon to the public at the Oklahoma state fair.

3. On or about June 13, 2003, Newman Systems and Ducane entered into a Confidential Non-Disclosure Agreement ("Confidentiality Agreement"). By the terms of the Confidentiality Agreement, Ducane agreed to accept and hold in confidence certain confidential and proprietary information relating to Newman Systems' business and products.

4. Ducane also agreed that it would only use the information from Newman Systems to determine whether to purchase or assist Newman Systems with the distribution and sale of Newman Systems' products or to enter into some other relationship with Newman Systems. Furthermore, Ducane agreed to return all of Newman Systems' confidential information upon Newman Systems' request or upon termination of its relationship with Ducane.

5. On August 8, 2003, John Ducate, Jr. ("Ducate"), CEO of Ducane, issued a letter (the "Patentability Letter") to Michael Mann, Esq. ("Mann"), an attorney with Nexsen Pruet. In the Patentability Letter, Ducate asked Mann to review an enclosed outline that described the

---

[1] To the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are also adopted as such.
[2] The Plaintiffs originally called the grill they developed the "RoadMaster Grill." However, for purposes of clarity, the term "Chuck Wagon" shall refer to all variations of the grill Plaintiffs' developed, and shall include all intellectual property rights associated with it.

2

Chuck Wagon to determine what features of the Chuck Wagon are patentable or may be listed as patent pending. Ducate issued a carbon copy of the Patentability Letter to Marc Newman.

6. Mr. Mann subsequently communicated with Plaintiffs regarding the Chuck Wagon. When contacted by Mr. Mann, the Plaintiffs did not inquire about Mr. Mann's experience, his billing rates, or expected charges in the matter.

7. There is no engagement letter between Nexsen Pruet and the Plaintiffs, or other typical client documents such as accounting records, or correspondence relating to the opening of a file in any of the Plaintiffs' names or on their behalf.

8. The Plaintiffs were never charged, and never paid, for any of Nexsen Pruet's services. Instead, Ducane specified and paid for Nexsen Pruet's services.

9. On or about August 18, 2003, the Plaintiffs and Ducane entered into an Exclusive Business Manufacturing and Products Marketing Agreement (the "Marketing Agreement").[3]

10. Pursuant to the terms of the Marketing Agreement, Ducane held the exclusive rights for the manufacturing, distribution, and sale of the Chuck Wagon and agreed to provide exclusive manufacturer and supplier services to Newman Systems.

11. In return, the Plaintiffs, as independent contractors of Ducane, agreed to be the primary marketing representatives for the Chuck Wagon.

12. The Plaintiffs knew that, pursuant to the Marketing Agreement, the patent application rights were to be owned by Ducane.

13. Under the terms of an Addendum to the Marketing Agreement ("Addendum 1"), which Plaintiffs and Ducane also executed on April 18, 2003, the parties agreed that if Ducane terminated the Marketing Agreement at any time, patents related to the Chuck Wagon

---

[3] Hereinafter the "Confidentiality Agreement" and the "Marketing Agreement" shall collectively be referred to as the "Agreements."

3

would become the sole property of Newman Systems; however, any patents specifically related to grill heads that Ducane developed as part of the Chuck Wagon would not belong to Newman Systems.

14. From August 2003 to early September 2003, Mann worked and corresponded with Plaintiffs while pursuing a patent for the Chuck Wagon on behalf of Ducane.

15. While pursuing a patent on behalf of Ducane, Mann drafted and sent to Plaintiffs, an Assignment of Rights, Title, and Interest in Invention (the "Assignment"), a patent application, and a power of attorney.

16. The record reflects certain e-mail correspondence from Mann to Plaintiffs for the period of August 18, 2003 to September 2, 2003. However, Plaintiffs did not submit further e-mail correspondence or any other forms of correspondence that they sent to Mann. The primary subject of the e-mail correspondence that Plaintiffs received from Mann concerned the exchange of technical information which was necessary to pursuing a patent for Ducane.

17. On September 2, 2003, Plaintiffs executed the Assignment wherein the Plaintiffs assigned all their rights, title, and interest in the Chuck Wagon to Ducane.

18. Plaintiffs did not file a notice of lien or interest in the Chuck Wagon at the United States Patent and Trademark Office, and they did not file a UCC-1 financing statement to protect any asserted interest in the Chuck Wagon.

19. Also on September 2, 2003, a Provisional Application for Patent Serial Number 60/499,604 (the "Provisional Application") was filed with the United States Patent and Trademark Office in order to pursue a patent for the Chuck Wagon for Ducane.[4]

20. On November 12, 2003, Plaintiffs met with Ducate, and at that meeting, Ducate advised Plaintiffs that Ducane may file for bankruptcy reorganization.

---

[4] As of September 2, 2004, the Provisional Application has expired.

21. On December 5, 2003 (the "Petition Date"), Ducane filed for chapter 11 bankruptcy relief.

22. On December 11, 2003, Ducate informed Plaintiffs of Ducane's chapter 11 filing. However, Plaintiffs did not hire or consult with an attorney with respect to the possible effect of the bankruptcy on their Agreements with Ducane.

23. On February 11, 2004, the Court entered an Order ("Bidding Order") establishing bidding procedures for the sale of Ducane's assets and granting protections to a proposed buyer.

24. On February 26, 2004, Ducane filed and served a Notice of Sale of Property ("Sale Notice") and a Motion for Order Authorizing (1) Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests and (2) Distribution of Sale Proceeds ("Sale Motion").

25. Ducane did not serve Plaintiffs with any Sale Notice, the Sale Motion, or the Bidding Order. However, in early February 2004, Marc Newman met with Ducate and Ducate advised Marc Newman of an impending sale of Ducane's assets to either Weber or the Ullman Family Partnership.

26. On March 3, 2004, the Court held a hearing on Ducane's Sale Motion. Weber was declared the successful bidder for Ducane's assets and the assets of F&S Realty, LLC for a purchase price of $13,600,000.

27. On March 5, 2004, the Court entered an Order ("Sale Order") authorizing (1) the sale of Ducane's assets free and clear of liens, claims, encumbrances, and other interests to Weber and (2) distribution of proceeds. Therefore, Weber obtained ownership of Ducane's rights in the Chuck Wagon.

5

28. On May 20, 2004, Plaintiffs filed a Complaint against Weber; Ducane; Ducane Products Company; and Ira Zolin, the former treasurer of Ducane and a current employee of Ducane Products Company.

29. After filing an Answer to Plaintiffs' Complaint, Weber filed a Motion for Summary Judgment. In response to Weber's Motion for Summary Judgment, Plaintiffs filed an Objection wherein they sought, *inter alia*, disqualification of Nexsen Pruet as counsel for Weber.

## CONCLUSIONS OF LAW

In this case, Plaintiffs argue that the Court should disqualify Nexsen Pruet from representing Weber in this adversary proceeding on conflict of interest grounds because (1) Plaintiffs believed that Nexsen Pruet represented them during the patent application process for the Chuck Wagon and (2) Nexsen Pruet's representation of Weber in this adversary proceeding should be prohibited because it constitutes advocating an interest materially adverse to Plaintiffs' interests in the patent application matter. Plaintiffs also contend that South Carolina law is controlling in this matter and that the applicable rule for disqualification of counsel for a conflict of interest derives from the "substantial relationship" test.[5] However,

---

[5] Plaintiffs quote Berg v. Marine Trust Co., N.A., 141 Wis.2d 878, 885, 416 N.W.2d 643, 647 (Wis. Ct. App. 1987) to state that the "substantial relationship" test provides "where an attorney represents a party in a matter in which the adverse party is that attorney's *former client*, the attorney will be disqualified if the subject matter of the two representations 'are substantially related.'" (emphasis added). However, as discussed later in this Order, Plaintiffs never had an attorney-client relationship with Nexsen Pruet. Therefore, Plaintiffs cannot be considered *former clients* of Nexsen Pruet for purposes of applying the "substantial relationship" test.

Moreover, Nexsen Pruet's representation of Weber and Ducane Products Co. in this adversary proceeding concerns alleged contractual obligations arising from Ducane's Agreements with Plaintiffs, which, apparently, Nexsen Pruet had no part in drafting, and not the prosecution of a patent for the Chuck Wagon, the central purpose of Nexsen Pruet's interaction with Plaintiffs. Thus, assuming *arguendo* the existence of an attorney-client relationship between Plaintiffs and Nexsen Pruet, applying the "substantial relationship" test would not result in the disqualification of Nexsen Pruet. Furthermore, to the extent Plaintiffs raise a patent infringement cause of action in their complaint, the Court notes that Plaintiffs conceded that they are not entitled to pursue a patent infringement action because the United States Patent and Trademark Office has not issued a patent for the Chuck Wagon. In light of these conclusions, the Court need not address Plaintiffs' "substantial relationship" argument further.

in their legal memorandum, Plaintiffs acknowledge that for their position to prevail that it is their burden is to demonstrate that (1) Plaintiffs and Nexsen Pruet maintained an attorney-client relationship and (2) communications between Plaintiffs and Nexsen Pruet were confidential and not subject to disclosure to Ducane.

As an additional argument, Plaintiffs also contend that Nexsen Pruet should be disqualified from representing Weber in this adversary proceeding because Nexsen Pruet's representation of Weber gives rise to an appearance of impropriety as viewed by a "common man." Under that argument, there is no need for an exchange of confidential information or a breach of confidentiality between Nexsen Pruet and Plaintiffs because the mere appearance of impropriety if observed by a "common man" is sufficient grounds for disqualifying Nexsen Pruet in this case.

In response to Plaintiff's assertions, Nexsen Pruet contends that it never maintained an attorney-client relationship with Plaintiffs; and as a result, Plaintiffs' communications with Nexsen Pruet were not confidential. Furthermore, Nexsen Pruet contends that Plaintiffs did not communicate with it for the purpose of obtaining legal counsel and advice.

In light of the arguments of the parties, the following issues are apparent: (1) what is the applicable law for determining whether to disqualify Nexsen Pruet, (2) whether Plaintiffs and Nexsen Pruet had an attorney-client relationship, (3) whether communications between Plaintiffs and Nexsen Pruet were confidential, and (4) whether the appearance of impropriety as observed by the "common man" is a legal standard that provides sufficient grounds for disqualifying Nexsen Pruet from representing Weber.

**I. Applicable Law**

In the District of South Carolina, "a motion to disqualify is a matter subject to the court's general supervisory authority to ensure fairness to all who bring their case to the judiciary for resolution." Clinton Mills, Inc. v. Alexander & Alexander, Inc., 687 F.Supp. 226, 228 (D.S.C. June 1, 1988). This Court has previously recognized that motions to disqualify counsel are "within the inherent supervisory powers of the court" and are also "committed to the court's sound discretion." Anderson v. Simchon (In re Southern Textile Knitters, Inc., Nos. 98-07203-W, 99-80026-W, slip op. at 3-4 (Bankr. D.S.C. Sept. 24, 1999). In light of the extensive discretion provided to courts when determining whether to disqualify counsel and the fact that disqualification of counsel issues are not unique to patent law, this Court shall apply the law of the Fourth Circuit to determine whether to disqualify Nexsen Pruet from representing Weber for purposes of the Motion for Summary Judgment that is currently before the Court. See Sun Studs, Inc. v. Applied Theory Assocs., Inc., 772 F.2d 1557, 1566 (Fed. Cir. 1985) ("procedural matters that are *not unique* to patent issues will be reviewed under the law of the particular regional circuit where appeals from the district court would normally lie.")(emphasis added).

While addressing the issue of disqualification of counsel, the Fourth Circuit recognizes that disqualification of counsel is a drastic measure that is not subject to "overly-mechanical adherence to disciplinary canons at the expense of litigants' rights to freely choose their counsel." Shaffer v. Farm Fresh, Inc., 966 F.2d 142, 146 (4th Cir. 1992) cert. denied 506 U.S. 1021 (1992). Although disqualification determinations must be predicated upon a proper application of applicable ethical principles, see id. at 145, the Fourth Circuit has noted that courts should "always remain mindful of the opposing possibility of misuse of

disqualification motions for strategic reasons." Id. Hence, an individual seeking to disqualify an opposing party's counsel "bears a high standard of proof to show that disqualification is warranted." Buckley v. Airshield Corp., 908 F.Supp. F.Supp. 299, 304 (D. Md. 1995) (quoting Tessier v. Plastic Surgery Specialists, Inc., 731 F.Supp. 724, 729 (E.D. Va. 1990)).

Given the Fourth Circuit's views, it appears that courts "should decide disqualification motions on a case-by-case analysis." Buckley v. Airshield Corp., 908 F.Supp. at 304. Moreover, it is in the public's interest to see that those who practice before the Court adhere to the South Carolina Code of Professional Responsibility.[6] Clinton Mills, Inc., 687 F.Supp. at 228.

## II. The Client-Lawyer Relationship

Determining whether a client-lawyer relationship exists is a fact intensive inquiry. Under Rule 407 of the South Carolina Appellate Rules ("SCACR"), the section entitled "Scope" provides as follows:

> Furthermore, for purposes of determining the lawyer's authority and responsibility, principles of substantive law external to these Rules determine whether a client-lawyer relationship exists. Most of the duties flowing from the client-lawyer relationship attach only after the client *has requested the lawyer to render legal services and the lawyer has agreed to do so*. But there are some duties, such as that of confidentiality under Rule 1.6, that attach when the lawyer agrees to consider whether a client-lawyer relationship shall be established. Whether a client-lawyer relationship exists for any purpose *can depend on the circumstances* and *may be a question of fact*. (emphasis added)

---

[6] Pursuant to District Court Local Rule 83.I.08, the District Court of South Carolina has adopted the Code of Professional Responsibility, which the Supreme Court of South Carolina adopted under Rule 407 of the South Carolina Appellate Court Rules, as its Code of Professional Responsibility. Local Civil Rule 83.I.08 DSC. Local Civil Rule 83.I.08 DSC is divided into various Rules of Disciplinary Enforcement. District Court Local Rule 83.I is referenced in Local Bankruptcy Rule 9010-1, and Local Bankruptcy Rule 9010-1 states that its provisions "shall be construed in conjunction with Local Rules 83.I and 83.X of the United States District Court for the District of South Carolina."

9

Scope, Rule 407, SCACR (2003).[7] Plaintiffs argue that the Patentability Letter sent by Ducane to Nexsen Pruet gives rise to a client-lawyer relationship whereby Nexsen Pruet would represent Plaintiffs in pursuit of a patent for the Chuck Wagon. However, Plaintiffs' reading of the Patentability Letter fails to recognize that the only client-lawyer relationship arising from the letter is between Ducane and Nexsen Pruet. In the letter, it is clear that Ducane is communicating with Nexsen Pruet in its own interests to obtain legal counsel regarding the patentability of any features of the Chuck Wagon; and thus, Ducane was Nexsent Pruet's client. See Marshall v. Marshall, 282 S.C. 534, 539, 320 S.E.2d 44, 47 (S.C. Ct. App. 1984)("A person attains the status of a 'client' when that person seeks legal advice by communicating in confidence with an attorney for the purpose of obtaining legal advice."). The simple fact that Ducane sent a carbon copy of the Patentability Letter to one of the Plaintiffs, Marc Newman, does not sufficiently demonstrate that Plaintiffs were also clients of Nexsen Pruet because nothing in the Patentability letter indicated that Plaintiffs were actively seeking legal advice *for themselves* from Nexsen Pruet.

Plaintiffs also submitted a series of e-mail correspondence between Plaintiffs and Nexsen Pruet in order to demonstrate the existence of an attorney-client relationship with Nexsen Pruet. However, the contents of the e-mail correspondence from Nexsen Pruet to Plaintiffs do not demonstrate that Plaintiffs communicated with Nexsen Pruet in order to obtain legal counsel or advice. The contents of that e-mail correspondence concerned technical topics relating to the construct of the Chuck Wagon. The technical information was necessary to further Ducane's interest in purchasing and patenting the Chuck Wagon.

---

[7] Rule 407, SCACR (2003) is included in Part IV of the SCACR. Rule 101, SCACR (2003) provides that "Part IV governs the admission to practice, conduct, discipline, continuing legal education, and other obligations and duties of attorneys in this State." Therefore, Rule 407, SCACR governs the conduct of attorneys practicing in the state of South Carolina.

Moreover, the Court notes that it is Plaintiffs' burden to present convincing testimony or other evidence demonstrating that they communicated with Nexsen Pruet in confidence for the purpose of obtaining legal counsel, and in light of the evidentiary record of this case, Plaintiffs have failed to do so.

Plaintiffs primarily rely on the decision and arguments set forth in the Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, 167 Fed. Supp. 2d 108 (D.Mass. 2001).[8] However, the facts in that case are readily distinguishable from the instant case. MEEI claimed it shared an attorney-client relationship with QLT's patent counsel and QLT argued that such a relationship did not exist. The court found that MEEI and QLT did share an attorney-client relationship based on the fact that MEEI sent a letter, marked "Confidential", to QLT's counsel relating to the invention. However, in this case, Plaintiffs did not place any correspondence to Nexsen Pruet similarly marked or designated as "confidential" into the record of this case, and they did not present any testimony or other evidence to indicate an expectation of confidentiality. As Plaintiffs point out in their Memorandum, Ducane, and not Plaintiffs, sent the letter to Nexsen Pruet and requested patent services for its benefit with respect to the Chuck Wagon invention.

Plaintiffs also claim that the power of attorney that Plaintiffs granted to Nexsen Pruet gives rise to an attorney-client relationship. In Sun Studs, Inc. v. Applied Theory Assocs., Inc., the Federal Circuit rejected an argument similar to Plaintiffs' contention that a power of attorney, which an inventor grants to counsel for an assignee of the inventor's patent rights,

---

[8] The Court notes that Plaintiffs cite to numerous authorities for the proposition that Plaintiffs held an attorney-client relationship with Nexsen Pruet or that their communications with Nexsen Pruet were subject to the attorney-client privilege. After close review of the authorities cited by Plaintiffs, the Court finds them inapplicable because the facts in those cases are significantly distinguishable from the facts in this case or are unconvincing; and therefore, those authorities do not provide sufficient legal grounds to disqualify Nexsen Pruet from representing Weber and Ducane Products Co.

11

constitutes an attorney-client relationship. The court in Sun Studs held that a power of attorney does not constitute an attorney-client relationship by recognizing that "[g]eneral principles of agency law indicate that a power of attorney does not *ipso facto* create an attorney-client relationship." 772 F.2d at 1568. It appears that the power of attorney granted by Plaintiffs is required by the patent application process because even where an invention has been assigned to another, the inventor must still be the applicant. Id. Under the circumstances of this case, the power of attorney that Plaintiffs granted to Nexsen Pruet does not give rise to a client-lawyer relationship.

Plaintiffs also appear to be arguing that an implied attorney-client relationship between Plaintiffs and Nexsen Pruet existed. However, "[b]efore a duty arises on the party [sic] of an attorney based upon implied or inferred attorney-client relationship or upon foreseeable reliance by one other than the actual client, more is required than an individual's 'subjective, *unspoken* belief that the attorney is his attorney.'" Liljeberg v. Hanvey (In re Cornerstone Residential Dev. Corp.), Nos. 97-52476C-7W, 99-6035, 2001 WL 1699685, at *4 (Bankr. M.D.N.C. May 30, 2001) (emphasis added). Additionally, just because an attorney for one party drafts documents memorializing an agreement between the parties, such conduct does not imply that the attorney intended to represent all parties similarly aligned with his client. Brown v. McCleskey, No. 07-99-0027-CV, 1999 WL 795478, at *6 (Tex. App. Oct. 6, 1999); see also Capitol Surgical Supplies, Inc. v. Casale, No. 02-4144, 2004 WL 180412, at **2-3 (3rd Cir. Jan. 28, 2004)(granting summary judgment in favor of attorney who drafted exclusive distribution agreement when attorney was not asked for legal advice, did not agree to provide legal assistance, and distributor did not pay or agree to pay any legal fees); Century Resouces Land L.L.C. v. Adobe Energy, Inc. (In re Adobe Energy, Inc.), No.

12

03-20013, 2003 WL 22703209, at *7 (5th Cir. Nov. 17, 2003)(affirming bankruptcy court's refusal to impose constructive trust on debtor's oil and gas lease because implied attorney-client relationship did not exist absent a sufficient showing of intent by both parties); SMWNPF Holdings, Inc. v. Devore, 165 F.3d 360, 365 (5th Cir. 1999)("[I]n the absence of evidence that the attorney knew a party had assumed he or she was representing it in a matter, the attorney has no affirmative duty to inform the party that he is not its attorney."); Stratagene v. Parsons Behle & Latimer, 315 F. Supp. 2d 765, 773 (D. Md. 2004)(dismissing patent owner's claim against law firm for failure to allege it had consulted, hired or retained the law firm); In re Infocure Securities Litigation, 210 F. Supp. 2d 1331, 1369 (N.D. Ga. 2002)(refusing to recognize implied attorney-client relationship when plaintiff paid no legal fees, had independent counsel, and never told attorney he was relying on him for legal advice); Wong v. Aragona, 815 F. Supp. 889, 896 (D. Md. 1993)(finding that implied attorney-client relationship requires a request for legal services and an acceptance by the attorney); Lichtman v. Taufer, No. 005560MARCHTERM 2004, 2004 WL 1632574, at * 8 (Pa. Com. Pl. July 13, 2004)(granting defendant's motion to dismiss when plaintiffs neither sought nor received legal assistance of law firm); Douglas v. Monroe, 743 N.E.2d 1181, 1184-85 (Ind. Ct. App. 2001)("[A] would-be client's *unilateral* belief cannot create an attorney-client relationship.") (emphasis added); In re Estate of Jones, 329 S.C. 97, 104, 495 S.E.2d 450, 454 n.1 (1998)("The fact that an attorney's services have inured to the benefit of others does not necessarily give rise to a contractual relationship."). Therefore, the fact that Nexsen Pruet drafted certain documents (in this case the Assignment, patent application, and power of attorney) on behalf of Ducane and provided them to Plaintiffs, while pursuing a

13

patent application for the Chuck Wagon, does not give rise to an attorney-client relationship between Plaintiffs and Nexsen Pruet.

The above circumstances indicate that no attorney-client relationship existed, and it was not reasonable for the Plaintiffs to believe that Nexsen Pruet was their attorney. Plaintiffs knew or should have known that Nexsen Pruet was Ducane's attorney as they were introduced to Nexsen Pruet by Ducane as Ducane's patent counsel. Pursuant to the Marketing Agreement, the Plaintiffs were to provide Ducane with the information needed for the patent application, and to assign their rights in the Chuck Wagon to Ducane. Nexsen Pruet, as Ducane's attorney, communicated with Plaintiffs in order to obtain the information from the Plaintiffs for the patent application; it then obtained the Assignment of Rights and filed the patent application on behalf of Ducane. Hence, in light of the foregoing, Plaintiffs have failed to carry their burden of demonstrating the existence of an attorney-client relationship with Nexsen Pruet.

### III. Communications Between Plaintiffs and Nexsen Pruet

Plaintiffs also contend that the Court should disqualify Nexsen Pruet from representing Weber and Ducane Products Co. in this adversary proceeding because Plaintiffs disclosure of confidential information to Nexsen Pruet gave rise to an attorney-client privilege. "Whether the attorney-client privilege applies should be determined on a case-by-case basis." In re Spalding Sports Worldwide, 203 F.3d 800, 805 (Fed.Cir. 2000). In the Fourth Circuit, "the responsibility of determining whether the privilege exists rests upon the District Judge and not upon the lawyer whose client claims the privilege." Duplan Corp. v Deering Milliken, Inc., 397 F.Supp. 1146, 1159-60 (D.S.C. 1974). Furthermore, because the attorney-client privilege is an obstacle to the investigation of the truth, the application of the

privilege "ought to be confined within the narrowest possible limits consistent with the logic of its principle," id. at 1159 (quoting N.L.R.B. v. Harvey, 349 F.2d 900 (4th Cir. 1965)), which is to "secure the objective freedom of mind for the client seeking legal advice." Id. at 1175.  See also EDNA SELAN EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE 4 (4th ed. 2001) [hereinafter, EPSTEIN].

In order for a privilege to apply, Plaintiffs must demonstrate that they communicated with Nexsen Pruet in confidence in order to seek legal advice from Nexsen Pruet. See In re the Regents of the University of California 101 F.3d 1386, 1390 (Fed.Cir. 1996). ("[T]he professional relationship for purposes of the privilege for attorney-client communications hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice."). See also Marshall v. Marshall, 282 S.C. at 539, 320 S.E.2d at 47 (stating that a person attains the status of client by communicating in confidence with an attorney for the purpose of seeking legal advice). The factual circumstances of this case indicate that Plaintiffs never sought legal advice from Mr. Mann, nor did they manifest an intent to do so either orally or in writing.

Plaintiffs cite In re Spalding Sports Worldwide for the proposition that an invention record is protected by the attorney-client privilege. 203 F.3d 800 (Fed.Cir. 2000). However, the court in Spalding Sports Worldwide recognized an attorney-client relationship between Spalding and its patent counsel because Spalding presented its invention record to legal counsel for the purpose of obtaining legal advice. See id. at 806 (". . . since Spalding's invention record was prepared and submitted *for the purpose of obtaining legal advice on patentability and legal services in preparing a patent application*, we conclude that it is privileged in its entirety.")(emphasis added). In this case, Plaintiffs have not established that

15

they communicated with Nexsen Pruet for the purpose of obtaining legal advice; therefore, Spalding Sports Worldwide is inapplicable to this case. Moreover, a closer review of the facts of Spalding Sports Worldwide reveals that the assignee of the patent was the party asserting the attorney-client privilege, not the assignor as in the present case.

The facts of this case indicate that Plaintiffs and Ducane were involved in ongoing negotiations, with respect to manufacturing and marketing of the Chuck Wagon, before they entered the Marketing Agreement. In order to further such negotiations, Plaintiffs and Ducane entered into the Confidentiality Agreement in order to prevent third parties from discovering the information that Plaintiffs exchanged with Ducane. By the terms of the Confidentiality Agreement, Plaintiffs only intended to conceal information from third parties and not Ducane or its counsel. To the extent Plaintiffs were willing to disclose information to Ducane pursuant to the terms of the Confidentiality Agreement and were willing to assist Ducane in pursuit of a patent for the Chuck Wagon, Plaintiffs' communications with Nexsen Pruet, as patent counsel for Ducane, did not implicate the attorney-client privilege because Ducane was privy to such communications as a result of an express agreement and an ongoing and developing business relationship with Plaintiffs. Plaintiffs communicated with Nexsen Pruet in order to fulfill their obligations under the Confidentiality Agreement and to benefit from a business relationship with Ducane. Not only have Plaintiffs failed to present any evidence indicating that they communicated with Nexsen Pruet in confidence for the purpose of seeking legal advice, they have also failed to cite to any confidential information integral to the legal issues raised by Defendants' Motion for Summary Judgment that was not already known by Ducane and which if presented by Weber might prejudice them.

Finally, Plaintiffs cite to the "common interest" privilege or "community of interest" doctrine for the proposition that their disclosures to Nexsen Pruet, while Nexsen Pruet pursued a patent application for the Chuck Wagon on behalf of Ducane, gave rise to the attorney-client privilege. Plaintiffs are apparently arguing that an attorney-client privilege can be implied from its relationship with Ducane and asserted against Weber to preclude Nexsen Pruet from acting as Weber's counsel in this adversary proceeding. The Court does not accept this argument for the reasons set forth below.

As stated previously, Plaintiffs did not establish an attorney-client relationship with Nexsen Pruet. Plaintiffs also failed to prove that Nexsen Pruet jointly represented Ducane and Plaintiffs. The facts before the Court indicate Nexsen Pruet only represented the interests of Ducane.

Furthermore, "[t]he common interest privilege does not apply between the clients if there is a falling out." EPSTEIN at 213. See also Duplan Corp. 397 F.Supp. at 1174 (quoting 8 WIGMORE, EVIDENCE § 2312 (McNaughten rev. 1961) which states "The chief instance occurs when the same attorney acts for two parties having a common interest and each party communicates with him. Here communications are clearly privileged at the instance of a third party. *Yet they are not privileged in a controversy between the two original parties*, inasmuch as the common interest and employment forbade concealment by either from the other.")(emphasis added). A "falling out" between two parties occurs when there is adversary litigation between them, EPSTEIN at 214; and "[o]nce the parties are in litigation with one another, neither may assert what was once a common privilege to preclude testimony against the other on an issue that was shared between them prior to the litigation." Id. Since Plaintiffs, Ducane and Weber are involved in litigation concerning the Agreements and the

17

Chuck Wagon, Plaintiffs may not use the common interest doctrine to preclude disclosure of information shared with Ducane and preclude Nexsen Pruet from representing Weber.

Finally, in this case, it is clear that the Agreements between Plaintiffs and Ducane allowed, if not required, the exchange of information concerning the Chuck Wagon. Since Weber is a successor in interest to Ducane's rights in the Chuck Wagon by virtue Weber's purchase of Ducane's assets pursuant to the Sale Order entered by the Court, Plaintiffs are likewise not entitled to assert the common interest privilege against Weber. Thus, any common interest Plaintiffs and Ducane may have shared does not provide grounds for disqualifying Nexsen Pruet under the circumstances of this case.

### IV. The Appearance of Impropriety

During the hearing on Defendants' Motion for Summary Judgment, Plaintiffs also argued that Nexsen Pruet should be disqualified from representing Weber because such representation gives rise to an appearance of impropriety as observed by the common man. The Court notes that Plaintiffs did not cite to any legal authority for such a proposition in any of their pleadings and their brief on this disqualification issue. Furthermore, the Court has been unable to find any legal authority establishing the criteria Plaintiffs proffer as a ground for disqualifying counsel. Since Plaintiffs bear the heavy burden of demonstrating that disqualification of counsel is appropriate, the Court is not persuaded by such an argument without citation to any legal authority establishing such a standard.

### V. Conclusion

In light of the foregoing analysis, Nexsen Pruet did not have a client-lawyer relationship with Plaintiffs and Plaintiffs' communications with Nexsen Pruet do not give rise to the

18

attorney-client privilege; therefore, Plaintiffs' request to disqualify Nexsen Pruet from representing Weber and Ducane Products Co. in this adversary proceeding is denied.

Furthermore, Plaintiffs, Ducane, Weber and Ducane Products Co. shall submit, within 10 days from entry of this Order, memoranda in the form of proposed orders which discuss whether the Court should grant the Motions for Summary Judgment filed by Weber and Ducane.

**AND IT IS SO ORDERED.**

*/s/ John E. Waites*
UNITED STATES BANKRUPTCY JUDGE

Columbia, South Carolina
October 7, 2004