IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re:<br><br>Ducane Gas Grills, Inc.,<br><br>                Debtor. | Case No. 03-15219-jw<br>Chapter 11 |
| Newman Grill Systems, LLC, Marc Newman,<br>and Amy Newman,<br><br>                Plaintiffs<br>v.<br><br>Ducane Gas Grills, Inc., Weber-Stephen Products<br>Co., Ira Zolin, and Ducane Products Co.,<br><br>                Defendants. | Adv. Pro. No. 04-80160-jw<br><br>**ORDER** |

      This matter comes before the Court upon the Motion for Summary Judgment filed by Weber-Stephen Products Co. ("Weber") and Ducane Products Co. ("DPC"), as defendants herein, and Newman Grill Systems, LLC ("NGS"), Marc Newman's and Amy Newman's (the "Newmans", and collectively with NGS, "Plaintiffs") opposition thereto. The parties submitted memoranda, affidavits, and transcripts of depositions[1] in support of their respective positions.

      Based upon the filings made by the parties, the affidavits and deposition testimony submitted by the parties, and the arguments of counsel at the hearing, the Court makes the findings of fact and conclusions of law.[2]

---

[1]     Although these depositions (of Marc Newman, Ira Zolin and John Ducate, Jr.) were taken after the hearing, the parties agreed, and the Court has granted permission, to allow the deposition testimony to be used by the parties in support of their respective positions on the summary judgment issues.

[2]     To the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are also adopted as such.

### FINDINGS OF FACT

1.     In April 2002, Marc and Amy Newman, who are members of NGS, began developing a specialized multi-purpose grill (the "Chuck Wagon") that could be transported to football games.[3]

2.     In September 2002, Plaintiffs introduced the Chuck Wagon to the public at the Oklahoma state fair.

3.     On or about June 13, 2003, Ducane Gas Grills, Inc., n/k/a DGG, Inc. ("Ducane") and NGS entered a Confidential Non-Disclosure Agreement (the "Confidentiality Agreement"). By the terms of the Confidentiality Agreement, Ducane agreed to accept and hold in confidence certain confidential and proprietary information relating to NGS's business and products.

4.     Ducane also agreed not to make any use of the information provided by NGS other than for purposes of evaluating whether Ducane would purchase and/or assist NGS in the distribution and sale of NGS's products or enter into some other business relationship with NGS.  Furthermore, Ducane agreed to return all of NGS's confidential information upon NGS's request or upon termination of their business relationship.

5.     On August 18, 2003, Ducane and Plaintiffs entered into an Exclusive Business, Manufacturing, and Products Marketing Agreement (the "Marketing Agreement") (hereinafter, the Confidentiality Agreement and the Marketing Agreement shall collectively be referred to as the "Newman Agreements").

6.     Pursuant to the terms of the Marketing Agreement, Ducane held the exclusive rights for the manufacturing, distribution, and sale of the Chuck Wagon and agreed to provide exclusive

---

[3]     The initial untrademarked name attributed by the Newmans to their portable grill/kitchen unit was the "Roadmaster." Later, Ducane and the Plaintiffs renamed the product the "Chuck Wagon." For purposes of clarity, the term "Chuck Wagon" shall refer to all variations of the Plaintiffs' grill and shall include all intellectual property rights associated with it.

manufacturer and supplier services to NGS.

7.      In return, Plaintiffs, as independent contractors of Ducane, agreed to be the primary marketing representatives for the Chuck Wagon.

8.      Pursuant to the Marketing Agreement, the Chuck Wagon was to be owned by Ducane.

9.      Under the terms of an Addendum to the Marketing Agreement ("Addendum 1"), which Ducane and Plaintiffs also executed on August 18, 2003, the parties agreed that if Ducane terminated or failed to renew the Marketing Agreement at any time, patents related to the Chuck Wagon would become the sole property of NGS; however, any patents specifically related to grill heads that Ducane developed as part of the Chuck Wagon would not belong to NGS.

10.      The termination provision of the Marketing Agreement provides that either Ducane or Plaintiffs "may terminate this [Marketing Agreement] for any or no reason by giving ninety (90) days notice to the other party prior to the end of the initial two (2) year term or any renewal term.  In addition, either party may terminate this Agreement early with sixty (60) days written notice to the other party in the event that the other party is in 'material default' of its obligations . . ."

11.      There is no evidence demonstrating that either Plaintiffs or Ducane terminated the Marketing Agreement or provided notice of material default of obligations pursuant to the termination provision.

12.      Plaintiffs assigned all their rights, title and interest in the Chuck Wagon to Ducane on September 2, 2003 by executing an Assignment of Rights, Title and Interest in Invention (the "Assignment").

13.      Also on September 2, 2003, a Provisional Application for Patent Serial Number

60/499,604 (the "Provisional Application") was filed by Ducane's attorneys with the United States Patent and Trademark Office ("USPTO") in order to pursue a patent for the Chuck Wagon for Ducane.[4]

14.    Plaintiffs did not file a notice of lien or interest in the Chuck Wagon at the USPTO, and they did not file a UCC-1 financing statement to protect any asserted interest in the Chuck Wagon.

15.    On November 12, 2003, Plaintiffs met with John Ducate, Jr. ("Ducate"), CEO of Ducane, and at that meeting, Ducate advised Plaintiffs that Ducane might file for bankruptcy reorganization.

16.    On December 5, 2003 (the "Petition Date"), Ducane filed for relief under Chapter 11 of the Bankruptcy Code[5].

17.    On December 11, 2003, Ducate informed Plaintiffs of Ducane's Chapter 11 filing. However, Plaintiffs did not hire or consult with an attorney with respect to the possible effect of the bankruptcy on the Newman Agreements.

18.    Soon after the filing of the bankruptcy case, issues arose regarding Ducane's proposed use of cash collateral, the right of Ducane's senior secured creditor, Fleet Capital Corporation ("Fleet"), to obtain stay relief, and the possible conversion of the case to Chapter 7. The issues placed Ducane's ability to successfully reorganize in doubt.

19.    On January 28, 2004, the Court conducted a hearing on Ducane's proposed continued use of cash collateral, on Fleet's motion for stay relief pursuant to 11 U.S.C. § 362(d), and on Fleet's motion to convert the bankruptcy case from a Chapter 11 case to a Chapter 7 case.

---

[4]    As of September 2, 2004, the Provisional Application has expired and no patent was issued for the Chuck Wagon.
[5]    The "Bankruptcy Code" refers to 11 U.S.C. § 101 et seq. Hereinafter, references to provisions of the Bankruptcy Code may be made by citing the applicable section of the Bankruptcy Code, or by the statute.

These matters resulted in the Order (1) Continuing Authorization of Debtor to Use Cash Collateral on Interim and Limited Basis; (2) Expediting Hearing on Motion for Relief from Stay if Necessary; and (3) Continuing Motion to Convert entered on February 4, 2004 (the "Order of February 4, 2004"), which required that Ducane immediately proceed with a sale of its assets or risk the loss of authorization to use cash collateral, the granting of stay relief to Fleet, and possibly conversion of the case to Chapter 7.

20.     On February 11, 2004, upon Ducane's motion, the Court entered an Order establishing bidding procedures for the sale of Ducane's assets and granting protections to a proposed buyer (the "Bidding Order").

21.     On February 26, 2004, Ducane filed and served a Notice of Sale of Property (the "Sale Notice") and a Motion for Order Authorizing (1) Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests and (2) Distribution of Sale Proceeds (the "Sale Motion").

22.     Ducane did not serve Plaintiffs with the Sale Notice, the Sale Motion, or the Bidding Order; however, in early February 2004, Marc Newman met with Ducate and Ducate advised Marc Newman of an impending sale of Ducane's assets to either Weber or the Ullman Family Partnership ("Ullman").

23.     On March 3, 2004, the Court held a hearing on Ducane's Sale Motion and, following a competitive bidding process, Weber was declared the successful bidder for substantially all of Ducane's assets and the assets of F&S Realty, LLC ("F&S") for an aggregate purchase price of $13,600,000.[6]

24.     On March 5, 2004, the Court entered its Order Authorizing (1) Sale of Assets of the Debtor Free and Clear of Liens, Claims, Encumbrances and Other Interests to Weber-Stephen

---

[6]     F & S Realty, LLC, a non-debtor entity, consented to the sale of its assets.

Products Co. and (2) Distribution of Sale Proceeds (the "Sale Order"). The Sale Order provides that Ducane's sale and transfer of ownership of its assets to Weber and/or Weber's assignee is free and clear of all liens, claims, encumbrances, and other interests.

25.    Shortly thereafter, on March 8, 2004, Ducane filed an Amended Disclosure Statement (the "Disclosure Statement") and an Amended Plan of Reorganization (the "Plan"). The Disclosure Statement and Plan restate and recognize with approval the court-approved sale to Weber and the proposed distribution of sales proceeds.

26.    On March 9, 2004, Weber and its assignee, DPC, formally purchased the Ducane and F&S assets pursuant to the terms of an Asset Purchase Agreement that went into effect on February 13, 2004 (as amended from time to time, the "Asset Purchase Agreement") and the terms of the Sale Order. The purchased assets included the Chuck Wagon. Therefore, Weber owns Ducane's interests in the Chuck Wagon.

27.    By the terms of the Asset Purchase Agreement, Weber did not assume either of the Newman Agreements.

28.    On April 27, 2004, Plaintiffs filed a Notice of Appearance and requested service in the case.

29.    On May 14, 2004, Plaintiffs filed an Application for Administrative Expense pursuant to § 503(b)(1) seeking compensation for postpetition sales and a buy-out of patent rights in the total amount of $975,368.80.

30.    On May 20, 2004, Plaintiffs filed a Complaint against Weber and Ducane.

31.    Also on May 20, 2004, after hearing on May 18, 2004, the Court approved the Amended Disclosure Statement filed by Ducane.

32.    On May 24, 2004, Ducane's bankruptcy counsel mailed a copy of the Court's Order

6

approving the Disclosure Statement, the Disclosure Statement, the Plan, an Addendum to the Disclosure Statement, and a Ballot for Accepting or Rejecting the Plan to Plaintiffs and their counsel.

33.    On June 4, 2004, Plaintiffs filed an Amended Complaint in which they added DPC and Ira Zolin ("Zolin") as defendants and alleged nine causes of action.

34.    Plaintiffs neither filed objection to Ducane's Plan nor filed a ballot rejecting the Plan. Plaintiffs' counsel attended the confirmation hearing on Ducane's Plan, but raised no objections to the Plan's confirmation.

35.    On June 11, 2004, Plaintiffs withdrew the Application for Administrative Expense.

36.    On June 23, 2004 the Court conducted a confirmation hearing on Ducane's Amended Plan. Counsel for Plaintiffs attended the hearing but did not object to confirmation.

37.    On June 25, 2004, the Court confirmed the Plan by entering an Order of Confirmation (hereinafter, the Plan, as confirmed by the Court, shall be referred to as the "Confirmed Plan").

38.    On July 30, 2004, Weber and DPC jointly filed their Summary Judgment Motion. In the Motion, Weber and DPC requested summary judgment on all causes of action that Plaintiffs allege against Weber and DPC in the Amended Complaint.

39.    At the hearing on Weber and DPC's Motion for Summary Judgment, Plaintiffs conceded that they are not entitled to pursue a patent infringement action against any of the parties because the USPTO has not issued a patent for the Chuck Wagon, and Plaintiffs stated their stipulation to the dismissal of such cause of action. Therefore, the Ninth Cause of Action in Plaintiffs' Amended Complaint with respect to patent infringement is dismissed and need not be discussed any further herein.[7]

---

[7]    In the Plaintiffs' Return to Weber and DPC's Motion for Summary Judgment, the Plaintiffs sought, inter alia, disqualification of Nexsen Pruet Adams Kleemeier, LLC ("Nexsen Pruet") as counsel for

## CONCLUSIONS OF LAW

Plaintiffs allege three remaining causes of action against Weber and DPC. In the First Cause of Action, Plaintiffs allege that Debtor failed to provide proper notice to Plaintiffs and follow the procedures set forth in § 365 regarding assumption and rejection and also seek to enforce the provisions of the Marketing Agreement against Weber and DPC; in the Seventh Cause of Action, Plaintiffs allege conversion and wrongful taking by Weber and DPC in regard to the Chuck Wagon; and, in the Eighth Cause of Action, Plaintiffs allege conspiracy by Ducane, Weber, DPC and Zolin in regard to Plaintiffs' loss of rights and/or value in the Chuck Wagon. Weber and DPC argue that they are entitled to judgment dismissing all three of Plaintiffs' claims against them as a matter of law because (1) Plaintiffs' claims are premised upon contract rights that are unenforceable against Weber as the good faith purchasers under the Sale Order, (2) Plaintiffs' claims are premised upon contract rights that are unenforceable against Ducane as the debtor-in-possession (and therefore Weber and DPC), and (3) Plaintiffs cannot establish the required elements of the causes of action alleged.

A.    **Standard of Review**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. When a motion for summary judgment is filed, the Court does not weigh the evidence, but determines if there is a genuine issue for trial. Listak v. Centennial Life Ins. Co., 977 F. Supp. 739, 743 (D.S.C. 1997) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505 (1986)). "If no material factual

---

Weber and DPC. On October 7, 2004, the Court entered an Order denying the Plaintiffs' request to disqualify Nexsen Pruet from representing Weber and DPC in this adversary proceeding.

disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial." Listak, 977 F. Supp. at 743 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986)). Upon making this showing, the burden shifts to the non-moving party to come forward with specific facts demonstrating that a genuine issue exists for trial. Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986).

**B.      Plaintiffs' Causes of Action Against Weber and DPC**

      1.    First Cause of Action – Failure to Properly Assume or Reject the Newman Agreements

Plaintiffs contend that Ducane failed to properly assume or reject the Newman Agreements pursuant to the procedures set forth in 11 U.S.C. § 365; therefore, Ducane, Weber, and DPC should be required to either (i) return any and all patents and plans related to the Chuck Wagon to NGS, or (ii) assume (or have been deemed to have impliedly assumed) the Newman Agreements and exercise a buy-out option specified in the Marketing Agreement upon termination. Weber and DPC argue that Plaintiffs do not hold a right or interest in the Chuck Wagon which is enforceable against Weber or DPC. Plaintiffs' assertions with respect to its First Cause of Action are impacted by the § 363 sale and Weber's status as a good faith purchaser, Debtor's confirmed plan of reorganization and the rejection of the Newman Agreements, and an analysis of the application of § 365 as well as Debtor's § 544 powers.

*Section 363 Sale and Good Faith Purchaser Status of Weber*

Plaintiffs first allege that they are not bound to the terms of the Sale Order and therefore are entitled to a return of the Chuck Wagon because they did not receive formal notice of Ducane's § 363 asset sale. In effect, Plaintiffs seek to rescind the sale to Weber and DPC.

Generally, § 363 proceedings are *in rem* proceedings that transfer property rights which are good against the world, not just against parties to a judgment or persons with notice of the proceeding. In re Met-L-Wood Corp., 861 F.2d 1012, 1018 (7th Cir. 1988). Further, in In re Edwards, the Seventh Circuit Court of Appeals stated that a "bona fide purchaser at a bankruptcy sale gets good title" and that such a principle decides the issue of determining the validity of a judicially approved sale of bankruptcy estate assets without notice to a party holding a security interest in property sold at a debtor's § 363 sale. 962 F.2d 641, 642 (7th Cir. 1992). Such a conclusion is particularly applicable in the context of this case since Plaintiffs hold no recorded property interest in the Chuck Wagon following their assignment of the Chuck Wagon to Ducane. Although it has been recognized that a § 363(b) sale that fails to comply with the notice or hearing requirements of the bankruptcy code and the applicable bankruptcy rules is invalid and may be set aside on appeal, In re Met-L-Wood Corp., the transfer of property thereunder is not void because § 363(m) provides that even a reversal on appeal of an order confirming or authorizing a § 363 sale will not affect the sale's validity if the buyer acted in good faith and the sale had not been stayed pending appeal. See 861 F.2d at 1018.[8]

In this case, the Sale Order entered by the Court recognizes Weber as a good faith purchaser of Ducane's assets entitled to the protections afforded by § 363(m). It is clear that Weber purchased the property as a result of an arms length transaction and a competitive bidding process which occurred in a public hearing before the Court. Plaintiffs have neither

---

[8]    11 U.S.C. 363(m) provides:
The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

challenged the Sale Order's good faith purchaser characterization of Weber nor appealed it. The Court notes that an individual may challenge an order authorizing a sale of estate assets by either (1) objecting to the proposed sale and then appealing the sale order to the district court or (2) attacking the order collaterally pursuant to Fed. R. Civ. P. 60(b), which is applicable to bankruptcy proceedings pursuant to Fed. R. Bankr. P. 9024. In re Alan Gable Oil Dev. Co, No. CA-90-913-A, 1992 WL 329419 at *3 (4th Cir. Nov. 12, 1992) (generally citing In re Met-L-Wood Corp., 861 F.2d 1012 (7th Cir. 1988)).

In this case, the time for appealing the Sale Order has expired; therefore, the validity of the sale is established, "even against nonparties to the sale proceeding." In re Met-L-Wood Corp., 861 F.2d at 1018. See generally United Mine Workers v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.), 99 F.3d 573, 586-87 (4th Cir. 1996) (discussing far-reaching and powerful effects of § 363 sales). Additionally, Plaintiffs have not properly filed any motion collaterally attacking the Sale Order entered in Ducane's bankruptcy case. Rather than appeal the Sale Order or collaterally attack it pursuant to Fed. R. Civ. P. 60(b), Plaintiffs attempt an end run and seek the return of the Chuck Wagon to them under theories based on § 365 and the terms of the Newman Agreements; theories which are properly asserted only against Ducane. Plaintiffs' suit represents an improperly disguised collateral attack on the Sale Order. See In re Met-L-Wood Corp., 861 F.2d at 1018 ("by seeking heavy damages from . . . the purchaser . . ., the suit is a thinly disguised collateral attack on the judgment confirming the sale"). See also Futuresource LLC v. Reuters Ltd., 312 F.3d 281 (7th Cir. 2002) (discussing extinguishment of all interests in certain acquired assets by § 363 sale, including all interests in intellectual property, and the inability of alleged interest holder to collaterally attack bankruptcy sale order). Pursuant to the provisions of the Sale Order, Weber acquired the

Ducane assets, including the Chuck Wagon, *free and clear of all liens, claims, encumbrances, and other interests.* Absent this Court vacating that order, any liens or encumbrances on the property attached to the sale proceeds, and Plaintiffs are limited to claims against the bankruptcy estate. Therefore, Weber and DPC are not subject to Plaintiffs' specific performance claims for the return or purchase of the Chuck Wagon because of the *res judicata* effect of the Sale Order entered by the Court. Accordingly, since the Sale Order remains valid and Plaintiffs have not properly pursued and received relief from its mandates, the Court finds, there being no genuine issue of material fact and as a matter of law, that Plaintiffs are neither entitled to demand that Weber and DPC return the Chuck Wagon to Plaintiffs nor seek damages from Weber and DPC.

Furthermore, § 363(m) embodies a strong policy of finality of bankruptcy sales which "provides, in turn, strong support for the principle that a bona fide purchaser at a bankruptcy sale gets good title even if the section does not of its own force preclude collateral attack on such sales." In re Edwards, 962 F.2d at 645. With this policy of finality in mind, and because the Sale Order has not been vacated, and under the circumstances of this case, the Court is not required to recognize interests in the Chuck Wagon that are beyond the property rights that the Sale Order provided to Weber and DPC, despite any issues the Plaintiffs raise concerning notice.[9] See id. (holding that what happens when a trustee or debtor in possession fails to make required notice of a § 363 sale is controlled by the policy of finality illustrated by § 363(m) and by the limited scope of Fed. R. Civ. P. 60(b)). See also In re Alan Gable Oil Dev. Co, No. CA-90-913-A, 1992 WL 329419 at *3 (4th Cir. Nov. 12, 1992) (holding that a district court did not abuse its discretion in declining to upset a § 363 sale where a party, which did not receive notice of escrow requirements for placing bids, failed to carry his burden of establishing the

---

[9]    The Court notes that the Plaintiffs had actual notice of Debtor's intent to sell its assets.

district court's abuse of discretion "in the face of the strong policy in favor of good faith

purchasers"). But see Citicorp Mortgage, Inc. v. Brooks (In re Ex-Cel Concrete Co., Inc.), 178

B.R. 198, 205 (9th Cir. B.A.P. 1995)(holding that an order selling real property free and clear

of liens was void because the notice of the sale free and clear of liens to a secured creditor

holding a valid second mortgage on the property sold was deficient).[10]  Thus, in light of the

foregoing, Plaintiffs lack standing to either demand that Weber and DPC return the Chuck

Wagon or claim damages from Weber and DPC for maintaining ownership and possession of

the Chuck Wagon.

<em>Binding Nature of Ducane's Confirmed Plan<br>and Rejection of Newman Agreements</em>

Ducane's rejection of the Newman Agreements pursuant to the terms of its Confirmed

Plan also has a significant impact on whether Plaintiffs may assert contractual obligations

arising from the Newman Agreements against Weber or DPC.  Before Ducane served Plaintiffs

with notice of its proposed disclosure statement and Plan, Ducane's bankruptcy counsel

provided notice of its intent to reject the Newman Agreements by sending a letter to Plaintiffs

dated March 25, 2004.  Thereafter, on May 24, 2004, Ducane provided Plaintiffs with notice of

a proposed disclosure statement, Plan, an addendum to the disclosure statement, and the date of

the confirmation hearing. Ducane's Plan provided that all executory contracts, including the

Newman Agreements, would be rejected under § 365(a).  Plaintiffs did not object to Ducane's

Plan nor cast a rejecting ballot when provided an opportunity to do so.

Although the March 25, 2004 letter did not constitute an effective rejection of executory

---

[10]      Since the Court does not recognize interests in the Chuck Wagon that are beyond the property rights that
the Sale Order and Ducane's confirmed chapter 11 plan provide to Weber and DPC, the Court finds this case
substantially distinguishable from Citicorp Mortgage, Inc. v. Brooks (In re Ex-Cel Concrete Co., Inc.) because,
unlike the second mortgagor in Citicorp Mortgage, Plaintiffs do not hold a properly secured interest in the Chuck
Wagon.

contracts with approval from the Court, 11 U.S.C. § 365(a), the Plan that Ducane properly noticed to Plaintiffs effectively rejected the Newman Agreements and became binding on the parties upon its confirmation. Upon Ducane's rejection of the Newman Agreements upon confirmation of its chapter 11 Plan, Plaintiffs became entitled to a damage claim against the estate and were barred from specifically enforcing the terms of the Newman Agreements against Ducane. 11 U.S.C. §§ 1141(a) & 365(a). See also First Union Commercial Corp. v. Nelson, Mullins, Riley and Scarborough (In re Varat Enterprises, Inc.), 81 F.3d 1310, 1315 (4th Cir. 1996) ("A bankruptcy court's order of confirmation is treated as a final judgment with res judicata effect."). Therefore, Plaintiffs do not have standing to enforce the Newman Agreements against Weber as a transferee of Ducane's assets in light of Ducane's rejection of the Newman Agreements.

*Application of 11 U.S.C. § 365 and Plaintiffs' Claim of a Remaining Right or Interest*

Finally, Plaintiffs argue the failure of Debtor to comply with § 365 should require Debtor, Weber and DPC to (i) return any and all patents and plans related to the Chuck Wagon to NGS, or (ii) to assume (or have been deemed to have impliedly assumed) the Newman Agreements and exercise the buy-out option specified in the Marketing Agreement in order to have the Chuck Wagon properly transferred to Weber and/or DPC. However, Plaintiffs voluntarily transferred all of their interests in the Chuck Wagon by executing an Assignment of Rights, Title and Interest in Invention on September 2, 2003. By separate contracts, the Newman Agreements, Plaintiffs sought to establish a remedy of the return of the Chuck Wagon in the event Ducane terminated the agreements regarding marketing and compensation. It appears that Plaintiffs never conditioned the subsequent Assignment upon the Newman Agreements. Therefore, § 365 is not implicated with respect to the Assignment and ultimate

sale of the Chuck Wagon. The § 363 sale of Debtor's property interest did not require the prior

assumption of the Newman Agreements, thus § 365 would not operate to invalidate the sale of

the Chuck Wagon to Weber or DPC. Weber and DPC did not purchase or assume the Newman

Agreements, and Debtor later rejected them pursuant to § 365 and its Plan as previously

discussed.[11]

Finally, even if Plaintiffs had an interest in the Chuck Wagon, Plaintiffs did not

preserve any interest in the Chuck Wagon in regards to third parties through proper recording.

In defense of Plaintiffs' asserted interest in the Chuck Wagon, Weber and DPC assert that any

provision in the Marketing Agreement regarding the return of the Chuck Wagon could at most

be construed as a security interest, and that interest was never recorded or otherwise perfected.

Pursuant to § 544, this right became a voidable obligation by Debtor and would be

unenforceable against the estate.[12]  Although no adversary proceeding has been filed with

respect to Debtor's § 544 avoidance powers, it has been recognized that 11 U.S.C. § 544 can be

asserted defensively, without the need to file an adversary proceeding.  See Pennsylvania

Capital Bank v. Glosser (In re Allen), 228 B.R. 115, 117-18 (Bankr. W.D. Pa. 1998) (debtor

and trustee raised in their answers to complaint ability of trustee to avoid liens pursuant to §

544(a); court concluded that defense properly raised); Mullins v. Paradise & Assoc. (In re

Paradise & Assoc.), 217 B.R. 452, 454 (Bankr. D. Del. 1997) (trustee permitted to raise

affirmative defense of § 544 for the first time on motion for summary judgment even though

not asserted in answer to complaint); GECC v. Spring Grove Transport Inc. (In re Spring Grove

Transport, Inc.), 202 B.R. 862, 863-64 (Bankr. E.D. Va. 1996) (trustee opposed relief from stay

motion by asserting § 544 avoidance powers; no adversary proceeding filed in order for court

---

[11]    The sale did include all intellectual property rights of Debtor.
[12]    Debtor and Weber/DPC defensively raised the operation of Debtor's § 544 powers to defeat Plaintiffs'
claim of a superior interest in the Chuck Wagon in support of their motions for summary judgment.

15

to find interest of movant unperfected); <u>Olsen v. Russell (In re Kleckner)</u>, 81 B.R. 464. 465-66 (Bankr. N.D. Ill. 1988) (section 544 defense raised by trustee in defense to defendant's argument in a § 547 adversary proceeding, court found requiring additional complaint under § 544(a) would not be in the interests of judicial economy and would be a waste of estate assets).

Some courts have also permitted the use of § 544 as a defense even in instances where the statute of limitations has run on the filing of such an action. <u>In re Loewen Group Int'l, Inc.</u>, 292 B.R. 522527-28 (Bankr. D. Del. 2003) (court permitted use of § 544 defensively in response to contested matter even though statute of limitation had run under § 546(a)); <u>In re Coan</u>, 96 B.R. 828, 831 (Bankr. N.D. Ill. 1989) (defensive reliance on § 544 permitted outside two-year time limit). Accordingly, courts have permitted the use of § 544 in a defensive posture without the necessity of formally filing an adversary proceeding, and the Court finds that based upon these principles and the facts of this case, Debtor, Weber, and DPC's use of § 544 in a defensive posture has been properly raised. [13]

Plaintiffs do not dispute that they failed to record any retained interest and do not raise other defenses to the § 544 argument. Accordingly, for the reasons set forth above, at the time of the sale it appears that Plaintiffs did not possess an interest in the Chuck Wagon that was

---

[13]    Even if the Court applied a strict rule to the application of § 544 and found that a separate adversary proceeding must be commenced, the Federal Rules provide, in relevant part, that

> When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a
> defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a
> proper designation.

Fed. R. Civ. P. 8(c); Fed. R. Bankr. P. 7008. The purpose behind Rule 8(c) "reflects the conscious attempt by the draftsmen to ignore pleading technicalities; it also promotes the liberality with which courts generally construe pleadings under the federal rules. 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1275. <u>See also</u> Canganelli v. Dep't of Public Welfare (In re Canganelli), 132 B.R. 369, 381-82 (Bankr. N.D. Ind. 1991) (debtor's right to discharge under § 727 raised as an affirmative defense to answer rather than by adversary complaint would be considered a counterclaim pursuant to Federal Rule 8(c)). Accordingly, even if Debtor's defense of § 544 should have been designated as a counterclaim, the Court would re-characterize it as such pursuant to Fed. R. Civ. P. 8(c).

sufficient to prevent Ducane from selling the Chuck Wagon to Weber or DPC.

Additionally, even the express terms of the Marketing Agreement do not require Ducane to return the Chuck Wagon to Plaintiffs or to execute the Marketing Agreement's buy-out provision if there is a breach of the contract. The Marketing Agreement provides that "Ducane *shall have the right* to purchase out Newman Grill's and or the Newman's right to receive fifty (50%) percent of the profits in sales of the Ducane 'Chuck Wagon Gas Grill' at any time after two (2) years from the date of this Agreement . . . ." Therefore, pursuant to the language of the Marketing Agreement, Ducane is not obligated to purchase Plaintiffs' right to receive profits under the Marketing Agreement but is simply given a right to do so after two years from the effective date of the Marketing Agreement. This provision of the Marketing Agreement which is entitled "Option to Purchase" confers a "right to purchase out" Plaintiffs' right to receive fifty (50%) percent of the profits from Chuck Wagon sales; the Marketing Agreement does not obligate Ducane to purchase anything from Plaintiffs.

Moreover, the addendum to the Marketing Agreement states, "In the event Ducane *terminates* or *fails to renew* this [Marketing Agreement] at anytime, any and all patents related to the Ducane Chuck Wagon Gas Grill become the sole property of Newman Grill Systems." In this case, Ducane has not terminated the Marketing Agreement pursuant to the termination provision, and the Marketing Agreement's term does not expire until December 31, 2008; therefore, the Marketing Agreement still exists and obligations that do not arise from termination of the Marketing Agreement remain. Furthermore, any and all patents related to the Ducane Chuck Wagon become the sole property of Newman Grill Systems only "in the event *Ducane terminates or fails to renew*" and does not provide for a similar result if Plaintiffs were to terminate the Marketing Agreement. Accordingly, because Ducane has not terminated

the Marketing Agreement and the Marketing Agreement remains effective until December 31, 2008, Ducane is not obligated to return the Chuck Wagon to Plaintiffs under the provisions of the Addendum 1 to the Marketing Agreement.

Additionally, Plaintiffs' First Cause of Action incorrectly presumes that Ducane's rejection of executory contracts terminated the Marketing Agreement.    In O'Neill v. Continental Airlines, Inc. (In re Continental Airlines), the Fifth Circuit stated, "Significantly, § 365 speaks only in terms of 'breach', [and] [t]he statute does not invalidate the contract, or treat the contract as if it did not exist."  981 F.2d 1450, 1459 (5th Cir. 1993).    A year later in Eastover Bank for Savings v. Sowashee (In re Austin Development Corp.), the Fifth Circuit stated that "the terms rejection, breach, and termination are used differently, but not inconsistently or interchangeably. . ." 19 F.3d 1077, 1082 (5th Cir. 1994).  The Fifth Circuit also stated that "The decision to reject is thus correctly viewed only as a 'power to breach' the executory contract or lease."  Id.  Therefore, Ducane's rejection of the Newman Agreements does not automatically result in their termination. See In re Continental Airlines, 981 F.2d at 1459.

Plaintiffs also incorrectly argue that they are entitled to specific performance of the Marketing Agreement as a remedy for Ducane's rejection of the Newman Agreements and resulting breach.  The Fourth Circuit has stated "Even though § 365(g) treats rejection as a breach, the legislative history of § 365(g) make clear that the purpose of the provision is *to provide only a damages remedy for the non-bankrupt party*."  Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.), 756 F.2d 1043, 1048 (4th Cir. 1985) (emphasis added);[14] see also Alongi, 272 B.R. at 154-55 ("[b]ecause the

---

[14]    The Court recognizes that 11 U.S.C. § 365(n) overrules the specific holding of Lubrizol by providing that

bankruptcy estate is not a party to an unassumed contract, there is neither a right of specific performance against the estate nor a right to recover damages against the estate, apart from the claims process."). Moreover, "[a]llowing specific performance would obliviously undercut the core purpose of rejection under § 365(a), and that consequence cannot therefore be read into congressional intent." Lubrizol, 756 F.2d at 1048. Accordingly, Plaintiffs are not entitled to claim specific performance as a method of relief from Ducane's rejection of executory contracts in light of 11 U.S.C. § 365(g), and are limited to claiming a prepetition unsecured claim for damages from Ducane but not Weber or DPC.

Plaintiffs also incorrectly argue that Ducane should be deemed to have assumed the Newman Agreements prior to confirmation of the Plan, under the theory of an implied assumption of the contracts. See In re Reda, Inc., 54 B.R. 871, 880 (Bankr. N.D. Ill., E.D. 1985)(finding that the debtor's actions with regard to an executory contract constituted an assumption of the contract for §365 purposes). However, "[t]he more generally followed rule is that acceptance of benefits (i.e. conduct) under an executory contract does not in and of itself work an assumption." In re A.H. Robins Co., Inc., 68 B.R. 705, 710 (Bankr. E.D. Va. 1986). See also Mason v. Official Committee of Unsecured Creditors for FBI Distribution Corp. and FBC Distribution Corp. (In re FBI Distribution Corp.), 330 F.3d 36, 45 (1st Cir. 2003) (the unilateral acts of the debtor-in-possession are not sufficient for assumption of an executory contract; court approval is required, which provides protection to unsecured creditors whose claims could be prejudiced by potentially burdensome contracts); In re Enron, 300 B.R. 201,

---

rejection of a technology license does not cancel the license. Dye v. Sandman Assocs., LLC (In re Sandman Assocs., LLC), 251 B.R. 473, 481 n. 15 (Bankr. W.D. Va. 2000). However, this Court does not view Plaintiffs' Agreements with Ducane as intellectual property licenses in light of the fact that Plaintiffs assigned all of their interests in the Chuck Wagon to Ducane. See Waterman v. Mackenzie, 138 U.S. 252, 255 (1891). Additionally, 11 U.S.C. § 365(n) is simply inapplicable to the factual circumstances present in Plaintiffs' case because Ducane is not a bankrupt intellectual property licensor under the terms of the Marketing Agreement. Therefore, this Court views the 11 U.S.C. § 365(g) analysis provided by the Fourth Circuit in Lubrizol applicable to factual circumstances in this case.

213-214 (Bankr. S.D.N.Y. 2003) ("The assumption of a contract cannot be implied because notice to creditors and court approval is specifically required before contractual burdens can be imposed on an estate").

Even if the Court were to accept Plaintiffs' implied assumption of executory contract argument, it would be limited in application to a determination of whether Plaintiffs' claim for breach of contract arising from Ducane's rejection of the Newman Agreements is entitled to administrative priority status.   Implied assumption would not provide a basis for an independent claim against Weber and DPC.   If Ducane were deemed to have assumed the Newman Agreements, any subsequent breach of the Marketing Agreement - by Ducane's failure and inability to transfer the Chuck Wagon to Plaintiffs - would only result in a Chapter 11 administrative priority claim against Ducane.   See Adventure Resources v. Holland, 137 F.3d 786, 798-799 (4th Cir. 1998)(breach of an assumed executory contract results in an administrative priority claim); Stewart Foods, Inc. v. Broecker (In re Stewart Foods, Inc.), 64 F.3d 141, 144 (4th Cir. 1995) ("The rejection or assumption of a contract does not determine whether a claim exists, but whether any claim that does exist is treated as a pre-petition obligation of the debtor or as an administrative expense entitled to highest priority."); West Virginia Hosp. Ins. Corp. v. Broaddus Hosp. Assoc. (In re Broaddus Hosp. Assoc.), 159 B.R. 763, 772 (Bankr. N.D. W. Va. 1993) (quoting In re A.H. Robins Co., Inc., 68 B.R. 705, 711 (Bankr. E.D. Va. 1986)).   See also 3 Collier on Bankruptcy ¶365.09[5](15th ed. rev)("Therefore, any damages flowing from the breach of a previously assumed contract should be considered first priority administrative expenses.").   Accordingly, Plaintiffs' implied assumption of executory contract action has no bearing upon Plaintiffs' adversary proceeding against Weber and DPC.

All of the elements relating to Plaintiff's First Cause of Action against Weber and DPC having been addressed, and no genuine issue of material fact remaining, judgment can be granted Weber and DPC on the First Cause of Action as a matter of law.

> 2.    Seventh Cause of Action – Conversion and Wrongful Taking and/or Detention

In the Seventh Cause of Action, Plaintiffs allege that Weber and DPC assumed and exercised ownership and control over the Chuck Wagon without the authorization of Plaintiffs, converted the Chuck Wagon to their own use and to the exclusion of the legal owner's rights, and that such actions constitute a wrongful taking and/or wrongful detention of Plaintiffs' property. To sustain a cause of action for conversion, a plaintiff must prove (1) an interest by the plaintiff in the thing converted; (2) the defendant converted the property to his or her own use; and (3) the use was without the plaintiff's permission. See Crane v. Citicorp Nat'l Servs., Inc., 313 S.C. 70, 437 S.E.2d 50 (1993) (superceded by statute on other grounds); Owens v. Andrews Bank & Trust Co., 265 S.C. 490, 220 S.E.2d 116 (1975); and Ralph King Anderson, Jr., *South Carolina Request to Charges - Civil* § 3-2 (2002).

However, Weber and DPC acquired ownership of the Chuck Wagon from Ducane pursuant to the provisions of this Court's Sale Order. Weber was determined to be a good faith purchaser pursuant to § 363(m). Furthermore, the transfer of the Chuck Wagon occurred after Plaintiffs voluntarily transferred and assigned all their interests in the Chuck Wagon to Ducane pursuant to the Assignment they executed. Additionally, it appears that Plaintiffs failed to properly record any interest in the Chuck Wagon. Whatever rights Plaintiffs assert rely on the terms of the Newman Agreements which were rejected by Ducane. Therefore, it appears that Plaintiffs no longer possess enforceable interests in the Chuck Wagon on which to base this cause of action.

Because Plaintiffs cannot establish any ownership rights or other legally enforceable interest in the Chuck Wagon, they cannot satisfy the first element of conversion or wrongful taking or detention – that of an ownership interest in the property that is claimed to have been taken or converted.  Therefore, there is no genuine issue of material fact and Weber and DPC are entitled to judgment as a matter of law on Plaintiffs' conversion cause of action.

### 3.    Eighth Cause of Action – Conspiracy

In the Eighth Cause of Action, Plaintiffs allege that Weber and DPC, together with Zolin and Ducane, conspired with one another to deprive Plaintiffs of their livelihood and property rights.   A civil conspiracy under South Carolina common law consists of three elements:   (1) a combination of two or more persons; (2) for the purpose of injuring the plaintiff; (3) which causes the plaintiff special damage.  Ellis v. Davidson, No. 3748, 2004 WL 369054, at *8 (Ct. App. Mar. 1, 2004); Lawson v. S.C. Dep't of Corrections, 340 S.C. 346, 532 S.E.2d 259, 261 (2000); First Union Nat'l Bank of S.C. v. Soden, 511 S.E.2d 372 (Ct. App. 1998).

The second element of civil conspiracy requires that defendants must have combined for the purpose of injuring the plaintiff.  In Lee v. Chesterfield Gen. Hosp., Inc., 344 S.E.2d 379, 383 (Ct. App. 1986), the court opined that this element is the "essential consideration" of a civil conspiracy action.  Conspiracy may be inferred from the very nature of the acts done, the relationship of the parties, the interests of the alleged conspirators, and other circumstances. Peoples Fed. Savs. & Loan Ass'n v. Resources Planning Corp., Op. No. 25812 (S.C. Apr. 26, 2004) (citing Island Car Wash, Inc. v. Norris, 292 S.C. 595, 353 S.E.2d 150 (Ct. App. 1987)). To establish a conspiracy, the plaintiff must produce evidence, either direct or circumstantial, which would allow a finder of fact to reasonably infer that the defendants had a "meeting of the minds" for the purpose of injuring the plaintiff.   In Bivens v. Watkins, 437 S.E.2d 132 (Ct.

App. 1993), the court held that an action for civil conspiracy will not lie if the plaintiff fails to establish that the purpose of the defendants was anything other than profit motivated.

Plaintiffs cite no evidence to support their conspiracy cause of action against Weber and DPC.  In his deposition, Marc Newman testified that he has no personal knowledge of his own of the alleged conspiracy, and that his belief of a conspiracy is based upon what Ducate told him regarding Zolin and Weber.  However, in his deposition, Ducate testified that he is not aware of any conspiracy.  Similarly, in his deposition, Zolin denied any conspiracy in response to this Motion.  Plaintiffs have identified no evidence to establish the first and second elements required to prove conspiracy.[15]

Prior to the purchase of Ducane assets, Weber was its competitor in business. Furthermore, the simple fact that Weber faced competition for Ducane's assets at the § 363 sale indicates that Weber's purchase of Ducane's assets was an arms length transaction. Ducane's § 363 sale was subject to intense scrutiny from the UST, and competing bidders, and no party to the sale demonstrated that Weber and Ducane conspired to act in an inappropriate manner.  The Court concluded that Weber was a good faith purchaser of Ducane's assets in the Sale Order. Therefore, in light of the Court's previous and undisturbed factual finding that Weber is a good faith purchaser of Ducane's assets, Plaintiffs have not established that Weber conspired with Ducane to purchase the Chuck Wagon at the § 363 auction sale in order to harm Plaintiffs.

Accordingly, without any means to satisfy the essential required elements of conspiracy, no genuine issue of material fact exists and Plaintiffs' Eighth Cause of Action must

---

[15]    In fact, the deposition testimony and the record of the bankruptcy case appear to disprove the conspiracy allegations.  Marc Newman, Ducate, and Zolin all testified that Ducane made post-petition payments to the Plaintiffs prior to the sale of Ducane's assets, and that Ducate spoke with Marc Newman several times before and after the filing of the bankruptcy case, advising him of the status of matters.  The Order of February 4, 2004 describes some of the circumstances which caused Ducane to sell its assets, and the timing of the sale.  As for the sale, Weber was the successful purchaser of the assets after competitive bidding. These facts, all undisputed, also refute the conspiracy allegation.

fail. Therefore, Weber and DPC are entitled to judgment as a matter of law on the Eighth

Cause of Action.

### C.      Conclusion

For the foregoing reasons, Weber and DPC are entitled to judgment in their favor, as a

matter of law, on the causes of action that Plaintiffs alleged against them.[16]   Accordingly,

Weber and DPC are hereby granted judgment on the First Cause of Action, the Seventh Cause

of Action and the Eighth Cause of Action alleged by Plaintiffs, and these causes of action are

denied.  The Ninth Cause of Action is dismissed pursuant to Plaintiffs' stipulation stated at the

Hearing.

**AND IT IS SO ORDERED.**

_John EWaites_
UNITED STATES BANKRUPTCY JUDGE

Columbia, South Carolina
_November 15_, 2004

---

[16]      According to pleadings submitted by counsel for Plaintiffs subsequent to the hearing on this matter, and based upon consultation with counsel, Plaintiffs have conceded, following discovery during the course of this litigation, that their claims against Weber and DPC have an insufficient evidentiary basis. Accordingly, immediately prior to the entry of this Order, Plaintiffs consented to summary judgment in favor of Weber and DPC on all causes of action against them.