

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

In re:

Ducane Gas Grills, Inc.,

                              Debtor.

---

Newman Grill Systems, LLC, Marc
Newman, and Amy Newman,

                              Plaintiffs,

v.

Ducane Gas Grills, Inc., Weber-Stephen
Products Co., Ira Zolin, and Ducane Products
Co.,

                              Defendants.

Case No. 03-15219-jw
Chapter 11

Adv. Pro. No. 04-80160-jw

**ORDER**

        This matter comes before the Court upon the Motion for Summary Judgment filed by

Ducane Gas Grills, Inc. ("Debtor"), as a defendant herein, and Newman Grill Systems, LLC

("NGS"), Marc Newman's and Amy Newman's (the "Newmans", and collectively with NGS,

"Plaintiffs") opposition thereto. The parties submitted memoranda, affidavits, and transcripts

of depositions[1] in support of their respective positions.

        Based upon the filings made by the parties, the affidavits and deposition testimony

submitted by the parties, and the arguments of counsel at the hearing, the Court makes the

following findings of fact and conclusions of law.[2]

---

[1]        Although these depositions (of Marc Newman, Ira Zolin and John Ducate, Jr.) were taken after the
hearing, the parties agreed, and the Court has granted permission, to allow the deposition testimony to be used by
the parties in support of their respective positions on the summary judgment issues.

[2]        To the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as
such, and to the extent any Conclusions of Law constitute Findings of Fact, they are also adopted as such.

## FINDINGS OF FACT[3]

1.      In April 2002, Marc and Amy Newman, members of NGS, began developing a

transportable and specialized multi-purpose grill (the "Chuck Wagon").[4]

2.      In September 2002, Plaintiffs introduced the Chuck Wagon to the public at the

Oklahoma state fair.

3.      On or about June 13, 2003, Debtor and NGS entered a Confidential Non-Disclosure

Agreement (the "Confidentiality Agreement").  Pursuant to the Confidentiality Agreement,

Debtor agreed to accept and hold in confidence certain confidential and proprietary

information relating to NGS's business and products.

4.      Debtor also agreed to only use the information provided by NGS to evaluate whether

Debtor should purchase and/or assist NGS in the distribution and sale of NGS's products or

enter into some other business relationship with NGS.  Additionally, Debtor agreed to return

all of NGS's confidential information upon NGS's request or upon termination of their

business relationship.

5.      On August 18, 2003, Debtor and Plaintiffs entered an Exclusive Business,

Manufacturing, and Products Marketing Agreement (the "Marketing Agreement")

(hereinafter, the Confidentiality Agreement and the Marketing Agreement shall collectively

be referred to as the "Newman Agreements").

6.      Pursuant to the terms of the Marketing Agreement, Debtor held the exclusive rights

for the manufacturing, distribution, and sale of the Chuck Wagon and agreed to provide

---

[3]      The Findings of Fact provided in this Order adopt , and in some instances, reiterate, the Findings of Fact
provided in Newman Grill Sys., LLC v. Ducane Gas Grills, Inc. (In re Ducane Gas Grills, Inc.), Nos. 03-15219,
04-80160, slip op. (Bankr. D.S.C. Nov. 15, 2004).
[4]      The initial untrademarked name attributed by the Newmans to their portable grill/kitchen unit was the
"Roadmaster."  Later, Debtor and the Plaintiffs renamed the product the "Chuck Wagon."  For purposes of
clarity, the term "Chuck Wagon" shall refer to all variations of the Plaintiffs' grill and shall include all
intellectual property rights associated with it.

exclusive manufacturer and supplier services to NGS.

7.      In return, Plaintiffs, as independent contractors of Debtor, agreed to be the primary marketing representatives for the Chuck Wagon.

8.      Pursuant to the Marketing Agreement, Debtor owned the Chuck Wagon and any derivatives of it.

9.      Under the terms of an Addendum to the Marketing Agreement ("Addendum 1"), which Debtor and Plaintiffs also executed on August 18, 2003, the parties agreed that if Debtor terminated or failed to renew the Marketing Agreement at any time, patents related to the Chuck Wagon would become the sole property of NGS; however, any patents specifically related to grill heads that Debtor developed as part of the Chuck Wagon would not belong to NGS.

10.     The termination provision of the Marketing Agreement provides that either Debtor or Plaintiffs "may terminate this [Marketing Agreement] for any or no reason by giving ninety (90) days notice to the other party prior to the end of the initial two (2) year term or any renewal term.  In addition, either party may terminate this Agreement early with sixty (60) days written notice to the other party in the event that the other party is in 'material default' of its obligations . . . ."

11.     Neither Plaintiffs nor Debtor have presented evidence demonstrating that either party terminated the Marketing Agreement or provided notice of material default of obligations pursuant to the Marketing Agreement's termination provision.

12.     Plaintiffs assigned all their rights, title and interest in the Chuck Wagon to Debtor on September 2, 2003 by executing an Assignment of Rights, Title and Interest in Invention (the "Assignment").

13.    Also on September 2, 2003, Debtor's patent attorneys filed a Provisional Application for Patent Serial Number 60/499,604 (the "Provisional Application") with the United States Patent and Trademark Office ("USPTO") in order to pursue a patent for the Chuck Wagon for Debtor.[5]

14.    Plaintiffs did not file a notice of lien or interest in the Chuck Wagon at the USPTO, and they did not file a UCC-1 financing statement to protect any asserted interest in the Chuck Wagon created by the terms of the Newman Agreements.

15.    On November 12, 2003, Plaintiffs met with John Ducate, Jr. ("Ducate"), CEO of Debtor, and at that meeting, Ducate advised Plaintiffs that Debtor might file for bankruptcy reorganization.

16.    On December 5, 2003 (the "Petition Date"), Debtor filed for relief under Chapter 11 of the Bankruptcy Code.[6]

17.    On December 11, 2003, Ducate informed Plaintiffs of Debtor's Chapter 11 filing. However, Plaintiffs did not hire or consult with an attorney in order to determine the possible effect of the bankruptcy on the Newman Agreements.

18.    Soon after Debtor filed its bankruptcy case, issues arose regarding Debtor's proposed use of cash collateral; the right of Debtor's senior secured creditor, Fleet Capital Corporation ("Fleet"), to obtain stay relief; and the possible conversion of the case to Chapter 7. Such issues posed a significant threat to Debtor's ability to successfully reorganize.

19.    On January 28, 2004, the Court conducted a hearing on Debtor's proposed continued use of cash collateral, on Fleet's motion for stay relief pursuant to 11 U.S.C. § 362(d), and on Fleet's motion to convert the bankruptcy case from a Chapter 11 case to a Chapter 7 case.

---

[5]    As of September 2, 2004, the Provisional Application has expired and no patent was issued for the Chuck Wagon.

[6]    "Bankruptcy Code," as used herein, refers to 11 U.S.C. § 101 et seq.

4

The resolution of these matters resulted in the Order (1) Continuing Authorization of Debtor to Use Cash Collateral on Interim and Limited Basis; (2) Expediting Hearing on Motion for Relief from Stay if Necessary; and (3) Continuing Motion to Convert entered on February 4, 2004 (the "Order of February 4, 2004"). The Order of February 4, 2004 required Debtor to immediately proceed with a sale of its assets or risk the loss of authorization to use cash collateral, the granting of stay relief to Fleet, and possibly conversion of the case to Chapter 7.

20.    On February 11, 2004, upon Debtor's motion, the Court entered an Order establishing bidding procedures for the sale of Debtor's assets and granting protections to a proposed buyer (the "Bidding Order").

21.    On February 26, 2004, Debtor filed and served a Notice of Sale of Property (the "Sale Notice") and a Motion for Order Authorizing (1) Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests and (2) Distribution of Sale Proceeds (the "Sale Motion").

22.    Debtor did not serve Plaintiffs with the Sale Notice, the Sale Motion, or the Bidding Order; however, in early February 2004, Marc Newman met with Ducate and Ducate advised Marc Newman of an impending sale of Debtor's assets to either Weber-Stephen Products Co. ("Weber") or the Ullman Family Partnership ("Ullman").

23.    On March 3, 2004, the Court held a hearing on Debtor's Sale Motion and, following a competitive bidding process, Weber was declared the successful bidder for substantially all of Debtor's assets and the assets of F&S Realty, LLC ("F&S") for an aggregate purchase price of $13,600,000.[7]

24.    On March 5, 2004, the Court entered its Order Authorizing (1) Sale of Assets of the Debtor Free and Clear of Liens, Claims, Encumbrances and Other Interests to Weber-Stephen

---

[7]        F & S Realty, LLC, a non-debtor entity, consented to the sale of its assets.

Products Co. and (2) Distribution of Sale Proceeds (the "Sale Order"). The Sale Order provides that Debtor's sale and transfer of ownership of its assets to Weber and/or Weber's assignee is free and clear of all liens, claims, encumbrances, and other interests. Furthermore, the Sale Order deemed Weber a good faith purchaser subject to the protections provided by § 363(m).

25.     Shortly thereafter, on March 8, 2004, Debtor filed an Amended Disclosure Statement (the "Disclosure Statement") and an Amended Plan of Reorganization (the "Plan"). The Disclosure Statement and Plan restate and recognize with approval the court-approved sale to Weber and the proposed distribution of sales proceeds.

26.     On March 9, 2004, Weber and its assignee, DPC, formally purchased the Debtor's and F&S's assets pursuant to an Asset Purchase Agreement that became effective on February 13, 2004 (as amended from time to time, the "Asset Purchase Agreement") and the terms of the Sale Order. The purchased assets included the Chuck Wagon. Therefore, Weber owns Debtor's interests in the Chuck Wagon.

27.     Under the terms of the Asset Purchase Agreement, Weber did not assume either of the Newman Agreements.

28.     On April 27, 2004, Plaintiffs filed a Notice of Appearance and requested service in the case.

29.     On May 14, 2004, Plaintiffs filed an Application for Administrative Expense pursuant to § 503(b)(1) seeking compensation for postpetition sales and a buy-out of patent rights in the total amount of $975,368.80.

30.     On May 20, 2004, Plaintiffs filed a complaint (the "Complaint") against Weber and Debtor.

31.    After a hearing held on May 18, 2004, the Court approved Debtor's Amended Disclosure Statement on May 20, 2004.

32.    On May 24, 2004, Debtor's bankruptcy counsel mailed, to Plaintiffs and their counsel, a copy of the Court's Order approving the Disclosure Statement, the Disclosure Statement, the Plan, an Addendum to the Disclosure Statement, and a Ballot for Accepting or Rejecting the Plan.

33.    On June 4, 2004, Plaintiffs amended the Complaint (the amended Complaint shall hereinafter be referred to as the "Amended Complaint") and filed it with the Court. In the Amended Complaint, Plaintiffs added DPC and Ira Zolin ("Zolin") as defendants and alleged nine causes of action.

34.    Plaintiffs neither filed an objection to Debtor's Plan nor filed a ballot rejecting the Plan.

35.    On June 11, 2004, Plaintiffs withdrew the Application for Administrative Expense.

36.    On June 23, 2004 the Court conducted a confirmation hearing on Debtor's Amended Plan. Plaintiffs' counsel attended the hearing but did not object to confirmation.

37.    On June 25, 2004, the Court confirmed the Plan and entered an Order of Confirmation (hereinafter, the Plan, as confirmed by the Court, shall be referred to as the "Confirmed Plan").

38.    On July 30, 2004, Weber and DPC jointly filed a Summary Judgment Motion. In the Motion, Weber and DPC requested summary judgment on all causes of action that Plaintiffs allege against Weber and DPC in the Amended Complaint.

39.    On August 12, 2004, Debtor filed a Motion for Summary Judgment.

40.    The Court has previously granted summary judgment to Weber and DPC on all causes

of action that Plaintiffs alleged against them in this adversary proceeding. [8]

41.    This Order addresses Debtor's Motion for Summary Judgment with respect to the following causes of action that Plaintiffs continue to assert against Debtor: (1) Failure to Properly Assume or Reject Executory Contract pursuant to 11 U.S.C. § 365; (2) Breach of Contract; (3) Breach of the Covenant of Good Faith and Fair Dealing; (4) Fraud; (5) Breach of Contract Accompanied by Fraudulent Intent; and (6) Negligence.[9]

## CONCLUSIONS OF LAW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.   When a motion for summary judgment is filed, the Court does not weigh the evidence, but determines if there is a genuine issue for trial.  Listak v. Centennial Life Ins. Co., 977 F. Supp. 739, 743 (D.S.C. 1997) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505 (1986)).  "If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial."  Listak, 977 F. Supp. at 743 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986)).

Upon making this showing, the burden shifts to the non-moving party to come forward with specific facts demonstrating that a genuine issue exists for trial.  Fed. R. Civ. P. 56(e);

---

[8]        In the Plaintiffs' Return to Weber and DPC's Motion for Summary Judgment, the Plaintiffs sought, inter alia, disqualification of Nexsen Pruet Adams Kleemeier, LLC ("Nexsen Pruet") as counsel for Weber and DPC.  On October 7, 2004, the Court entered an Order denying the Plaintiffs' request to disqualify Nexsen Pruet from representing Weber and DPC in this adversary proceeding.

[9]        In the Amended Complaint, Plaintiffs also alleged Conversion and Conspiracy against Debtor, however, by letter dated October 20, 2004, Plaintiffs' counsel advised the Court that Plaintiffs were only asserting the six causes of action listed and addressed in this Order.  In light of the letter provided by Plaintiffs' counsel, the Court deems Plaintiffs' Conversion and Conspiracy causes of action withdrawn.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986).

In the present case, the Plaintiffs have asserted numerous causes of action against Debtor that concern the parties' relationship under the Newman Agreements. Debtor has rejected the Newman Agreements, which, pursuant to 11 U.S.C. §365 (g)(1) [10], constitutes a breach relating back to "immediately before the date of the filing of the petition." Because of such breach, the Plaintiffs may be entitled to a general unsecured claim against Debtor. Lavigne v. Medical Malpractice Ins. Assoc. (In re Lavigne), 114 F.3d 379, 389 (2nd Cir. 1997)(stating that the purpose of section 365(g) "is to make clear that, under the doctrine of relation back, the other party to a contract that has not been assumed is simply a general unsecured creditor.").

## 1. Failure to Properly Assume or Reject Executory Contract pursuant to 11 U.S.C. § 365

In this First Cause of Action, Plaintiffs allege that Debtor's rejection of the Newman Agreements should constitute termination of those Agreements and that, according to the terms of the Agreements, they are entitled to a return of the Chuck Wagon. In the alternative, Plaintiffs also contend that Debtor improperly rejected the Newman Agreements pursuant to the provisions of § 365 because Debtor assumed the Newman Agreements by acts constituting an implied assumption of executory contracts. In light of the issues raised by Plaintiffs, the Court shall address them seriatim.

*Rejection of the Newman Agreements and Termination*[11]

In O'Neill v. Continental Airlines, Inc. (In re Continental Airlines), the Fifth Circuit

---

[10]    Further references to the Bankruptcy Code shall be by section number only unless otherwise stated.
[11]    The Court has previously addressed this issue in Newman Grill Systems, LLC v. Ducane Gas Grills, Inc. (In re Ducane Gas Grills, Inc.), Nos. 03-15219, 04-80160, slip op. (Bankr. D.S.C. Nov. 15, 2004) and adopts and reiterates to some extent its holding here.

stated, "[s]ignificantly, § 365 speaks only in terms of 'breach', [and] [t]he statute does not invalidate the contract, or treat the contract as if it did not exist." 981 F.2d 1450, 1459 (5th Cir. 1993). A year later in <u>Eastover Bank for Savings v. Sowashee (In re Austin Development Corp.)</u>, the Fifth Circuit stated that "the terms rejection, breach, and termination are used differently, but not inconsistently or interchangeably. . ." 19 F.3d 1077, 1082 (5th Cir. 1994). In light of the structure of § 365, the Fifth Circuit concluded "[t]he decision to reject is thus correctly viewed only as a 'power to breach' the executory contract or lease." <u>Id.</u> The Fifth Circuit is not alone in reaching such a conclusion. The bankruptcy court in the District of Maryland has similarly noted that "[r]ejection of an executory contract, because it constitutes a breach, does not terminate the contract." <u>In re Alongi</u>, 272 B.R. 148, 152 (Bankr. D. Md. 2001). Thus, in light of such authority, Debtor's rejection of the Newman Agreements does not automatically result in their termination.

The language of the Newman Agreements also provides support for the view that the Newman Agreements were not terminated. The addendum to the Marketing Agreement states, "In the event Debtor *terminates* or *fails to renew* this [Marketing Agreement] at anytime, any and all patents related to the Ducane Chuck Wagon Gas Grill become the sole property of Newman Grill Systems." In this case, Debtor has simply not terminated the Marketing Agreement pursuant to the termination provision provided.

### *Plaintiffs' Demand for Specific Performance*

Plaintiffs also claim that they are entitled to specific performance of the terms of the Newman Agreements pursuant to § 365. However, the Fourth Circuit has stated "[e]ven though § 365(g) treats rejection as a breach, the legislative history of § 365(g) makes clear that the purpose of the provision is *to provide only a damages remedy for the non-bankrupt*

*party*." Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.), 756 F.2d 1043, 1048 (4th Cir. 1985) (emphasis added);[12] see also Alongi, 272 B.R. at 154-55 ("[b]ecause the bankruptcy estate is not a party to an unassumed contract, there is neither a right of specific performance against the estate nor a right to recover damages against the estate, apart from the claims process."). Moreover, "[a]llowing specific performance would obviously undercut the core purpose of rejection under § 365(a), and that consequence cannot therefore be read into congressional intent." Lubrizol, 756 F.2d at 1048.

Furthermore, as result of the § 363 sale to Weber, a good faith purchaser pursuant to § 363(m), Debtor no longer can return the Chuck Wagon. As the Court determined in Newman Grill Systems, LLC v. Ducane Gas Grills, Inc. (In re Ducane Gas Grills, Inc.), Nos. 03-15219, 04-80160, slip op. (Bankr. D.S.C. Nov. 15, 2004), Plaintiffs do not hold a sufficient interest in the Chuck Wagon to prevent Debtor from selling the Chuck Wagon to Weber or to require Debtor to return the Chuck Wagon to Plaintiffs in light of Debtor's rejection of the Newman Agreements. Plaintiffs did not preserve any interest in the Chuck Wagon in regards to third parties through proper recording of a security interest. In defense of Plaintiffs' demand for return of the Chuck Wagon, Debtor contends that Plaintiffs no longer have any rights or interests in the Chuck Wagon in light of the Assignment Plaintiffs executed. Following the execution of the Assignment, Plaintiffs' interest in the Chuck Wagon, if any, was an unrecorded and unsecured interest in the Chuck Wagon pursuant to the Newman Agreements. Pursuant to § 544, any unrecorded interest claimed by Plaintiffs

---

[12]   The Court recognizes that 11 U.S.C. § 365(n) overrules the specific holding of Lubrizol. Dye v. Sandman Assocs., LLC (In re Sandman Assocs., LLC), 251 B.R. 473, 481 n. 15 (Bankr. W.D. Va. 2000). However, this Court does not view Plaintiffs' Agreements with Debtor as intellectual property licenses because Plaintiffs assigned all of their interests in the Chuck Wagon to Debtor. See Waterman v. Mackenzie, 138 U.S. 252, 255 (1891). Additionally, 11 U.S.C. § 365(n) is inapplicable to the factual circumstances in Plaintiffs' case because Debtor is not a bankrupt intellectual property licensor under the Marketing Agreement. Therefore, this Court views the 11 U.S.C. § 365(g) analysis provided by the Fourth Circuit in Lubrizol applicable to this case.

through provisions of the Newman Agreements that provided for a return of the Chuck Wagon became voidable obligations by Debtor and would be unenforceable against the estate.[13]   Although no adversary proceeding has been filed with respect to Debtor's § 544 avoidance powers, § 544 can be asserted defensively, without the need to file an adversary proceeding in some instances.  See Newman Grill Sys., LLC v. Ducane Gas Grills, Inc. (In re Ducane Gas Grills, Inc.), Nos. 03-15219, 04-80160, slip op. at 15-16 (Bankr. D.S.C. Nov. 15, 2004).  Accordingly, Plaintiffs are not entitled to the return of the Chuck Wagon as a specific performance remedy for Debtor's rejection of executory contracts in light of § 365(g) and Debtor's § 544 avoidance powers, and are limited to claiming a prepetition unsecured claim for damages from Debtor's bankruptcy estate pursuant to § 502(g).[14]

As stated previously, Debtor had not terminated the Marketing Agreement, and the Marketing Agreement's term does not expire until December 31, 2008; therefore, the obligations under the Marketing Agreement still exist.  According to the terms of the Marketing Agreement, any and all patents related to the Debtor Chuck Wagon become the sole property of Newman Grill Systems only "in the event *Debtor terminates or fails to renew*" and does not provide for a similar result if Plaintiffs were to terminate the Marketing Agreement.  Because Debtor has not terminated the Marketing Agreement, Debtor is not obligated to return the Chuck Wagon to Plaintiffs under the provisions of Addendum 1 to the Marketing Agreement.

---

[13]    Debtor and Weber/DPC defensively raised the operation of Debtor's § 544 powers to defeat Plaintiffs' claim of a superior interest in the Chuck Wagon in support of their motions for summary judgment.

[14]    11 U.S.C. § 502(g) provides as follows:

> A claim arising from the rejection, under section 365 of this title or under a
> plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or
> unexpired lease of the debtor that has not been assumed shall be determined,
> and shall be allowed under subsection (a), (b), or (c) of this section or
> disallowed under subsection (d) or (e) of this section, the same as if such claim
> had arisen before the date of the filing of the petition.

Plaintiffs also assert that Debtor should be required to fulfill the terms of a buy-out provision contained in the Marketing Agreement as a result of Debtor's rejection of the that Agreement. However, the terms of the Marketing Agreement do not require Debtor to execute the buy-out provision if there is a breach of the contract. The Marketing Agreement provides that "[Debtor] *shall have the right* to purchase out [Plaintiffs'] right to receive fifty (50%) percent of the profits in sales of the Ducane 'Chuck Wagon Gas Grill' at any time after two (2) years from the date of this Agreement . . . ." Therefore, pursuant to the language of the Marketing Agreement, Debtor is not obligated to purchase Plaintiffs' right to receive profits under the Marketing Agreement but is simply given a right to do so after two years from the effective date of the Marketing Agreement. This provision of the Marketing Agreement which is entitled "Option to Purchase" confers a "right to purchase out" Plaintiffs' right to receive fifty (50%) percent of the profits from Chuck Wagon sales; the Marketing Agreement does not obligate Debtor to purchase anything from Plaintiffs.

### Implied Assumption of Newman Agreements

Plaintiffs also assert that Debtor's post-petition compliance with the Marketing Agreement or sale of the Chuck Wagon to Weber constitutes an implied assumption of the Marketing Agreement. To support their argument, Plaintiffs cite In re Reda, Inc., 54 B.R. 871, 880 (Bankr. N.D. Ill. 1985), finding that the debtor's actions with regard to an executory contract constituted an assumption of the contract for § 365 purposes. However, § 365(a) specifically requires court approval of any assumption of an executory contract, and "[t]he more generally followed rule is that acceptance of benefits (i.e. conduct) under an executory contract does not in and of itself work an assumption." In re A.H. Robins Co., Inc., 68 B.R. 705, 710 (Bankr. E.D. Va. 1986). See also Newman Grill Sys., LLC v. Ducane Gas Grills,

Inc. (In re Ducane Gas Grills, Inc.), Nos. 03-15219, 04-80160, slip op. at 19 (Bankr. D.S.C.

Nov. 15, 2004)(citing cases). Furthermore, "[i]t is a rare instance that the conduct of the

debtor-in-possession with regard to an executory contract will constitute an assumption of that

agreement for section 365 purposes." In re A.H. Robins Co., Inc., 68 B.R at 710 (citing

cases). The Court also notes that the Reda case has been characterized as an anomaly that

should be limited to its unique factual circumstances. See West Virginia Hosp. Ins. Corp. v.

Broaddus Hosp. Assoc. (In re Broaddus Hosp. Assoc.), 159 B.R. 763, 772 (Bankr. N.D. W.

Va. 1993)(declining to follow Reda because the case *sub judice* did not "represent the 'rare

instance' considered by other courts"). In light of the requirements of § 365(a) and the

narrow applicability of Reda, the Court does not find that Debtor should be viewed to have

assumed the Marketing Agreement by implication.[15]

Even if the Court determined that Debtor implicitly assumed any of the Newman

Agreements and then subsequently breached a term of these Agreements, Plaintiffs would

simply be entitled to treat their breach of contract claim as a Chapter 11 administrative

priority claim against Debtor. In re Ducane Gas Grills, Inc., Nos. 03-15219, 04-80160, slip

op. at 19 ("If Ducane were deemed to have assumed the Newman Agreements, any

subsequent breach of the Marketing Agreement . . . would only result in a Chapter 11

administrative priority claim against Ducane."). See also Adventure Resources v. Holland,

137 F.3d 786, 798-799 (4th Cir. 1998)(breach of an assumed executory contract results in an

administrative priority claim); Stewart Foods, Inc. v. Broecker (In re Stewart Foods, Inc.), 64

F.3d 141, 144 (4th Cir. 1995) ("The rejection or assumption of a contract does not determine

whether a claim exists, but whether any claim that does exist is treated as a pre-petition

---

[15]    This conclusion was also made by the Court in Newman Grill Sys., LLC v. Ducane Gas Grills, Inc. (In
re Ducane Gas Grills, Inc.), Nos. 03-15219, 04-80160, slip op. (Bankr. D.S.C. Nov. 15, 2004).

obligation of the debtor or as an administrative expense entitled to highest priority."); <u>West Virginia Hosp. Ins. Corp. v. Broaddus Hosp. Assoc. (In re Broaddus Hosp. Assoc.)</u>, 159 B.R. 763, 772 (Bankr. N.D. W. Va. 1993) (quoting <u>In re A.H. Robins Co., Inc.</u>, 68 B.R. 705, 711 (Bankr. E.D. Va. 1986)).   <u>See also</u> 3 <u>Collier on Bankruptcy</u> ¶365.09[5](15[th] ed. rev)("Therefore, any damages flowing from the breach of a previously assumed contract should be considered first priority administrative expenses.").

However, since the Court has concluded, as a matter of law, that Debtor did not assume the Newman Agreements even by implication, any breach damages arising from Debtor's rejection of the Newman Agreements shall be treated as general unsecured obligations pursuant to Debtor's confirmed chapter 11 plan and the application of § 365 and § 502(g).  A determination of the amount of damages Plaintiffs are entitled to collect from Debtor's bankruptcy estate as an unsecured creditor resulting from Debtor's rejection of the Newman Agreements pursuant to § 365 and § 502(g) remains an issue subject to trial. Accordingly, Debtor's Motion for Summary Judgment on Plaintiffs' First Cause of Action is granted since Debtor has properly rejected the Newman Agreements pursuant to § 365.

**2.   Debtor's Breach of the Confidentiality Agreement and Marketing Agreement**

In their Second Cause of Action, Plaintiffs contend that Debtor failed to perform its obligations pursuant to the Confidentiality Agreement and the Marketing Agreement.  In their Amended Complaint, Plaintiffs allege that Debtor had an obligation to protect Plaintiffs' interest in the Chuck Wagon and to return the Chuck Wagon to Plaintiffs pursuant to the terms of the Confidentiality Agreement.  Debtor argues that it never had an obligation to return the Chuck Wagon to Plaintiffs and that Plaintiffs assigned all their interests in the

Chuck Wagon to Debtor pursuant to the execution of an Assignment of Rights, Title and Interest in Invention.

As stated herein, Debtor did not have an obligation to return the Chuck Wagon because Debtor did not terminate the Marketing Agreement. Furthermore, Debtor, through application of § 544, could avoid Plaintiff's asserted interests in the Chuck Wagon. Debtor's bankruptcy filing also has a significant impact on Debtor's obligations under the Newman Agreements. After Debtor commenced its Chapter 11 case, but before Debtor assumed or rejected executory contracts, the Newman Agreements remained in existence, enforceable by Debtor but not against Debtor. United States Postal Serv. v. Dewey Freight Sys., Inc., 31 F.3d 620, 624 (8th Cir. 1994)("After a debtor commences a Chapter 11 proceeding but before executory contracts are assumed or rejected under § 365(a), those contracts remain in existence, enforceable by the debtor but not against the debtor.")(citing N.L.R.B. v. Bildisco, 465 U.S. 513, 532 (1984)). See also In re Nat'l Steel Corp., 316 B.R. 287, 305 (Bankr. N.D. Ill. 2004)(citing cases)("most courts agree that before an executory contract is assumed or rejected under § 365(a), that contract continues to exist, enforceable by the debtor-in-possession, but not enforceable against the debtor-in-possession."); In re Payless Cashways, Inc., 305 B.R. 303, 308 (Bankr. W.D. Mo. 2004)(noting that insurance policies remained in effect postpetition because the automatic stay prevented creditor-insurer from enforcing the terms of the policies against debtor and debtor had not yet assumed or rejected the policies). After filing for Chapter 11 bankruptcy on the petition date, Debtor was no longer obligated to satisfy any of its obligations under the Newman Agreements; and as a result, Plaintiffs could not enforce the Newman Agreements postpetition. Thus, Plaintiffs have no standing to raise a

cause of action for a postpetition breach of contract by Debtor and may only enforce their ability to claim damages from Debtor pursuant to § 365 and § 502(g).

Moreover, Debtor's rejection of the Newman Agreements pursuant to the terms of its Confirmed Plan also has a significant impact on whether Plaintiffs may assert contractual obligations arising from the Newman Agreements. On May 24, 2004, Debtor provided Plaintiffs with notice of a proposed disclosure statement, Plan, an addendum to the disclosure statement, and the date of the confirmation hearing. Debtor's Plan provided that all executory contracts, including the Newman Agreements, would be rejected under § 365(a). Plaintiffs did not object to Debtor's Plan nor cast a rejecting ballot when provided an opportunity to do so. The Plan that Debtor properly noticed to Plaintiffs effectively rejected the Newman Agreements and became binding on the parties upon its confirmation. After rejection of the Newman Agreements became effective pursuant to confirmation of Debtor's plan, Plaintiffs were only entitled to a damage claim against the estate and were barred from specifically enforcing the terms of the Newman Agreements against Debtor pursuant to Article III and V of the confirmed plan. 11 U.S.C. §§ 1141(a) & 365(a). See also First Union Commercial Corp. v. Nelson, Mullins, Riley and Scarborough (In re Varat Enterprises, Inc.), 81 F.3d 1310, 1315 (4th Cir. 1996) ("A bankruptcy court's order of confirmation is treated as a final judgment with res judicata effect."). Therefore, to the extent that Plaintiffs seek the return of the Chuck Wagon under the terms of the Newman Agreements due to a breach of the Newman Agreements, the Court concludes that Plaintiffs are bound to the terms of the confirmed plan and are not entitled to such relief.

In light of the foregoing analysis, the Court grants judgment to Debtor on Plaintiffs' Second Cause of Action. However, Plaintiffs are entitled to damages arising from Debtor's

rejection of the Newman Agreements pursuant to § 365 and § 502(g) as stated earlier in the Court's summary judgment analysis of Plaintiffs' First Cause of Action.

**3.      Breach of the Covenant of Good Faith and Fair Dealing**

Plaintiffs contend that they are entitled to damages as a result of Debtor's breach of the implied covenant of good faith and fair dealing.  Under South Carolina law, "[t]here exists in every contract an implied covenant of good faith and fair dealing." Tharpe v. G.E. Moore Co., Inc., 254 S.C. 196, 201, 174 S.E.2d 397, 399 (S.C. 1970).  However, in RoTec Servs. Inc. v. Encompass Servs., Inc., the South Carolina Court of Appeals held that the implied covenant of good faith and fair dealing is not an independent cause of action separate from a claim for breach of contract. 359 S.C. 467, 473, 597 S.E.2d 881, 884 (S.C. Ct. App. 2004).  In RoTec, the court noted that the South Carolina Supreme Court "treated the implied covenant of good faith and fair dealing as merely another term of the contract at issue." Id. at 884 (citing and quoting Boddie-Noell Props., Inc. v. Magnolia P'ship, 352 S.C. 437, 444, 574 S.E.2d 726, 730 (2002)).  Therefore, Plaintiffs' cause of action for breach of the implied covenant of good faith and fair dealing is not an independent cause of action separate from their claim for breach of contract.  RoTec, 359 S.C. at 472, 597 S.E.2d at 884.  See Osborn v. Univ. Med. Assocs., 278 F.Supp. 2d 720, 741 (D.S.C. 2003)(noting that under South Carolina law tort remedies are not available for breach of the implied covenant of good faith and fair dealing in the employment context); Williams v. Reidman, 339 S.C. 251, 267-74, 529 S.E.2d 28, 36-40 (S.C. Ct. App. 2000)(holding that a tort action for breach of the implied covenant of good faith and fair dealing is unique to insurance law and is not available in an action for breach of an employment contract).  Therefore, this Court grants summary judgment in favor of Debtor on Plaintiffs' Third Cause of Action.  RoTec, 359 S.C. at 471, 597 S.E.2d at 883.

**4.      Pre-Petition and Post-Petition Fraud**

In the Fourth Cause of Action raised in Plaintiffs' Amended Complaint, Plaintiffs assert that Debtor committed an act of prepetition and postpetition fraud by misrepresenting a willingness to fulfill obligations under the Newman Agreements in order to induce Plaintiffs to perform contractual obligations.  As a result of the alleged misrepresentation, Plaintiffs assert that they suffered damages in the form of loss of value of the Chuck Wagon and additional business expenses.  As a remedy for Debtor's alleged acts of fraud, Plaintiffs seek an award of actual and punitive damages as stated in their Amended Complaint.

In order to claim damages for an alleged act of fraud, Plaintiffs must prove the following elements:  (1) a representation; (2) its falsity; (3) its materiality; (4) knowledge of the falsity or reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance upon the truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.  Hansen v. DHL Laboratories, Inc., 316 S.C. 505, 511, 450 S.E.2d 624, 627-28 (S.C. Ct. App. 1994). Furthermore, under South Carolina law, unfulfilled promises or statements as to future events do not amount to fraud; however, if at the time the promise is made, the party making the promise has no intention of keeping it, the promise then amounts to an actionable fraudulent misrepresentation of fact. Id. at 626 (citing cases).

In light of Debtor's summary judgment motion and the current record of this case, it appears that a genuine issue of material fact is whether Debtor made any representation to continue fulfilling its obligations under the Newman Agreements, as alleged by Plaintiffs, with no intention of keeping the promise.  Plaintiffs' claim for any damages resulting from Debtor's alleged misrepresentation of performance under the Newman Agreements, if

19

established prepetition, would be a prepetition unsecured claim. Any claim for damages postpetition may rise to the level of an administrative expense claim but would be limited to damages that may have arisen between the Petition Date and March 25, 2004, the date Debtor advised Plaintiffs of its intent to reject the Newman Agreements. As of March 25, 2004, Plaintiffs were on written notice of Debtor's intent to reject the Newman Agreements.[16] Therefore, the Court grants partial summary judgment with respect to Plaintiffs' Fourth Cause of Action, with the remaining claim as stated herein to go to trial.

5.    **Breach of Contract Accompanied by a Fraudulent Act**

In order to have a claim for breach of contract accompanied by fraudulent act under South Carolina law, Plaintiffs must establish the following three elements: (1) a breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) fraudulent act accompanying the breach. Conner v. City of Forest Acres, 348 S.C. 454, 465-66, 560 S.E.2d 606, 612 (S.C. 2002). "The fraudulent act is any act characterized by dishonesty in fact or unfair dealing." Id. Furthermore, the Court must determine the existence of fraud in light of the "facts and peculiar circumstances" present in this case. Id. at 612 (quoting Sullivan v. Calhoun, 117 S.C. 137, 139, 108 S.E. 189, 189 (S.C. 1921)).

In this case, the Court has granted summary judgment to Debtor on Plaintiffs' Second Cause of Action for breach of contract. Since the Court has concluded that Plaintiffs' are without standing to assert a separate claim for breach of contract but may only claim damages pursuant to § 502(g) as a result of Debtor's rejection under § 365, Plaintiffs cannot establish that Debtor breached the Newman Agreements by failing to fulfill its obligations postpetition.

---

[16]    Although the Amended Complaint seeks actual and punitive damages with respect to the Fourth Cause of Action, any claim for the return of the Chuck Wagon, to the extent Plaintiffs seek it as a remedy to this Fourth Cause of Action, is denied.

Therefore, Plaintiffs lack the first element of their breach of contract accompanied by fraudulent act cause of action.

Plaintiffs also contend that Debtor committed a fraudulent act associated with the breach of the Newman Agreements by willfully failing to fulfill an alleged duty to return the Chuck Wagon and all confidential business information pursuant to the terms of Newman Agreements. However, Debtor's failure to return the Chuck Wagon and confidential information provided by Plaintiffs is a product of Debtor's § 363 sale to a good faith purchaser, proper rejection of the Newman Agreements pursuant to § 365, avoidance powers under § 544, and postpetition protection from enforcement of executory contracts. Furthermore, the confirmation of Debtor's chapter 11 plan indicates that Debtor rejected the Newman Agreements without any fraudulent intent or accompanied by any fraudulent act because confirmation of Debtor's chapter 11 plan implicitly establishes that Debtor rejected the Newman Agreements in good faith. See 11 U.S.C. § 1129(a)(3).[17]

Without demonstrating a breach of contract and being foreclosed from alleging that Debtor lacked good faith when rejecting the Newman Agreements as a result of confirmation of Debtor's Chapter 11 plan, the Court finds that Plaintiffs cannot sufficiently allege a breach of contract accompanied by fraudulent act. Therefore, in light of the foregoing analysis, the Court grants summary judgment to Debtor with respect to Plaintiffs' Fifth Cause of Action.

---

[17] The Court's Order of Confirmation provides that, pursuant to § 1129(a)(3), all provisions of Debtor's plan were proposed in good faith and not by any means forbidden by law. See In re Ducane Gas Grills, Inc., No. 03-15219, slip op. (Bankr. D.S.C. June 25, 2004)(noting that the requirements of § 1129(a) have been satisfied). Debtor rejected the Newman Agreements pursuant to a provision of its confirmed plan. Confirmation of Debtor's plan establishes Debtor's good faith rejection of the Newman Agreements, and Plaintiffs are bound by the res judicata effect of the Order of Confirmation. See First Union Commercial Corp. v. Nelson, Mullins, Riley and Scarborough (In re Varat Enterprises, Inc.), 81 F.3d 1310, 1315 (4th Cir. 1996)("A bankruptcy court's order of confirmation is treated as a final judgment with res judicata effect.").

**6.    Negligence**

As an alternative to the breach of contract action, Plaintiffs alleged that Debtor committed an act of negligence by failing to fulfill duties imposed by the Confidentiality Agreement and the Marketing Agreement. As an action for negligence based upon breach of contractual terms, Plaintiffs' Sixth Cause of Action must be dismissed because "South Carolina law has long recognized the principle that no tort claim will lie when the parties' duties are defined by contract." Wilson Group, Inc. v. Quorum Health Care Resources, Inc., 880 F. Supp. 416, 429 (D.S.C. 1995)(citing Meddlin v. Southern Ry.-Carolina Div., 62 S.E.2d 109, 112 (S.C. 1950) and Foxfire Village, Inc. v. Black & Veatch, Inc., 304 S.C. 366, 375, 404 S.E.2d 912, 918 (S.C. Ct. App. 1991)). Furthermore, the District Court for the District of South Carolina has stated that "the court must be vigilant in preventing the inevitable efforts of lawyers to turn every breach of contract action into a tort." Wilson Group, Inc., 880 F. Supp. at 429 (quoting Myrtle Beach Pipeline Corp. v. Emerson Elec. Co., 843 F. Supp. 1027, 1043 (D.S.C. 1993). (internal quotations omitted). In light of the foregoing, the Court dismisses Plaintiffs' Sixth Cause of Action as a matter of law because it is an improper negligence claim against Debtor for failure to fulfill contractual obligations arising from the Newman Agreements.

## CONCLUSION

In conclusion, the Court grants summary judgment to Debtor on Plaintiffs' First, Second, Third, Fifth, and Sixth Causes of Action for the reasons stated above. However, with respect to Plaintiffs' First Cause of Action, the Court recognizes, as did Debtor, that Plaintiffs have an unsecured prepetition claim against Debtor's bankruptcy estate for a prepetition breach of the Newman Agreements arising from Debtor's rejection of the Newman

Agreements pursuant to § 365 and Debtor's confirmed plan. Therefore, Plaintiffs are only entitled to a remedy for Debtor's rejection and deemed breach of the Newman Agreements pursuant to the provisions of § 365 and § 502(g). Furthermore, to the extent Plaintiffs request a return of the Chuck Wagon and specific performance of the buy-out provisions of the Marketing Agreement pursuant to § 365, the Court grants judgment to Debtor and concludes that Plaintiffs are not entitled to such relief.

With respect to Plaintiffs' Fourth Cause of Action for prepetition and postpetition fraud, the Court grants Debtor partial summary judgment since a genuine issue of material fact remains but Plaintiffs' remedy for any damages is limited. Accordingly, if Plaintiffs establish all the required elements of fraud at trial, any prepetition fraud damages that Plaintiffs prove for Debtor's prepetition fraudulent acts shall be treated as unsecured claims against Debtor's bankruptcy estate, and any postpetition fraud damages that Plaintiffs prove for Debtor's postpetition acts of fraud are limited to damages, if any, arising before March 25, 2004, the day that Debtor, by letter, advised Plaintiffs that it intended to reject the Newman Agreements.

Thus, the Court shall schedule a trial to determine the unsecured damages suffered by Plaintiffs in light of Debtor's rejection of the Newman Agreements pursuant to § 365 and § 502(g) and whether Debtor is responsible for acts of fraud that give rise to additional damages to Plaintiffs.

**AND IT IS SO ORDERED.**

_____
UNITED STATES BANKRUPTCY JUDGE

Columbia, South Carolina
November 24, 2004